[Filed June 14, 1887.]

# STATE OF OREGON, RESPONDENT, *v.* DAN MORAN, APPELLANT

EVIDENCE—CRIMINAL LAW—MOTION TO STRIKE OUT EVIDENCE.—The physician who made the *post mortem* examination and testified at the inquest, as well as the coroner, were called as witnesses, for the purpose of proving the death of deceased, and in their evidence they each called the deceased by his true name, though they had no knowledge of his true name other than having heard him referred to by that name. *Held,* the court did not err in refusing to strike out such evidence.

SECTION 169 OF THE CRIMINAL CODE—STATE v. WINTZINGERODE, 9 OR. 153, APPROVED.—Section 169 of the Criminal Code is only declaratory of the rule of the common law.

CONFESSION AS EVIDENCE—DUTY OF THE COURT WHEN OFFERED.—Whenever a confession is offered in evidence against the accused, the court must ascertain and determine as a question of fact, whether or not it was obtained by the influence of hope or fear applied by a third person to the prisoner's mind. This inquiry is preliminary and is addressed entirely to the judge.

EVIDENCE—CONFESSIONS OF PRISONER MADE UNDER AGREEMENT WITH THE DISTRICT ATTORNEY.—The appellant agreed with the district attorney that he would testify fully and freely in the case then pending against one Kelley on a charge for the same killing, and did so testify before the coroner's jury and the grand jury, but during Kelley's trial, the appellant escaped and Kelley was acquitted. *Held,* that when the defendant was put on his trial for the same killing, his confessions and former testimony might be given in evidence against him. (*Commonw.* v. *Knapp,* 10 Pick. 477, approved and followed.)

EVIDENCE GIVEN BEFORE THE GRAND JURY.—If in the opinion of the trial court the ends of public justice require it, such court may allow a member of the grand jury to testify as to what any witness testified to before that body, if such evidence is otherwise competent.

CRIMINAL LAW—INDICTMENT—EVIDENCE.—Under section 748, Code of Criminal Procedure, where it is charged that the prisoner killed deceased by administering poison, *held,* that it is competent to prove that the poison was in fact administered by the hand of another, provided it be shown that the defendant procured the act to be done, or aided, abetted, or in any manner assisted in the commission of the crime.

EVIDENCE—READING A MEMORANDUM OF FACTS BY WITNESS BEFORE GOING ON THE WITNESS STAND.—Evidence given by a witness is not incompetent, for the reason that before going on the witness stand he refreshed his memory by reading

a narrative of the facts written by another. Such an objection goes to the weight of the evidence, the credit which it ought to receive, and not to its competency. Here the witness had some knowledge of the facts—how much does not appear—before looking at the memorandum.

EVIDENCE—DEFENDANT'S ADMISSION.—An admission made by the defendant that a short time after the administration of the poison—morphine—which destroyed the life of deceased, he took money from the pocket of said deceased to keep for him, was properly received, on the ground that the entire statement is to be taken together, and it is not objectionable even if it tended to prove another offense.

CRIMINAL LAW—PRACTICE—VIEW BY THE JURY.—Where the jury by agreement of counsel and the direction of the court visited the scene of the murder, and also the county jail, without the presence of the prisoner, *held*, that these facts furnished no sufficient reason why sentence should not be pronounced on the verdict. (*State* v. *Ah Lee*, 8 Or. 214, approved and followed.)

APPEAL from Multnomah County.

*Henry E. McGinn,* and *Nathan D. Simon,* for Respondent.

*Chamberlain & Morrow,* for Appellant.

STRAHAN, J.—On the eighteenth day of November, 1886, the appellant was indicted for the crime of murder in the first degree by the grand jury of Multnomah County. The charging part of the indictment is as follows: "The said Dan Moran, on the seventh day of July, A. D. 1886, in the county of Multnomah and State of Oregon, purposely and of deliberate and premeditated malice killed Frederick Kaluscha, by then and there administering to him, the said Frederick Kaluscha, poison, namely morphine, contrary to the statute in such cases made and provided, and against the peace and dignity of the State of Oregon." Thereafter a trial of said cause was had before a jury, which resulted in a verdict of guilty as charged in the indictment. Afterwards, on motion of the defendant, the court set aside the verdict and granted him a new trial. On the second trial, the jury found the defendant guilty of manslaughter, upon which verdict the court sentenced him to imprisonment in the penitentiary of the State of Oregon for fifteen years, from which judgment he has appealed to this court.

Upon the trial here, counsel for the appellant, as well as the State, have displayed great research and ability, and the various questions presented were exhaustively argued, and it now only

remains for the court to state the conclusion reached, and to indicate the reasons therefor.

1. On the trial in the court below counsel for appellant moved to strike out the evidence of Coroner De Linn and Dr. Bevan. The evidence which was included in this motion was in substance this: Coroner De Linn testified that he took the body of deceased to the morgue, where an inquest was held; found his name was Frederick Kaluscha, and that he was a carpenter on board the ship Candidate. On his cross-examination he testified that he knew the name of the deceased by hearing witnesses testify to it, and that he had no personal acquaintance with the deceased. Dr. Bevan's evidence was to the same effect. The evidence in neither case was objected to when offered; but in addition to this objection to counsel's position, there was no particular controversy upon the trial as to the identity of the deceased. O'Brien and other witnesses testified to his identity very fully. The object in calling the coroner and Dr. Bevan was to prove the fact of death, and not the identity of the deceased. The court did not err in refusing to strike out this evidence.

2. On the trial in the court below the State introduced the declarations of Moran given under oath, before the magistrate, in the case of the *State* v. *James Kelley,* who was charged with the crime of murder in the killing of Kaluscha; also the declarations of Moran given under oath before the grand jury of Multnomah County in the same case. Counsel for the defense claim that the declarations and admissions under oath before the committing magistrate ought not to have been admitted, for the reason they were given and made upon an understanding with the district attorney and the police officers, that if he would testify fully as to all he knew in relation to the poisoning of Kaluscha, that he, Moran, should not be prosecuted for any complicity therein. They also object to the statements made by Moran before the grand jury in the same matter, for the same reasons, and upon the further ground that it was incompetent for the trial court to allow the proceedings before the grand jury to be made public for this purpose.

3. It must be taken as settled in this State that section 169 of the Criminal Code is only declaratory of the common-law rule in relation to confessions. (*State* v. *Wintzingerode,* 9 Or. 153.) Upon the trial of a criminal case, therefore, whenever a confession is offered in evidence against the accused,'it becomes necessary for the court to ascertain and determine whether or not the confession has been obtained by the influence of hope or fear applied by a third person to the prisoner's mind. This inquiry is preliminary, and is addressed to the judge who admits the proof—the confession—to the jury, or rejects it, as he may or may not find it to have been drawn from the prisoner by the application of those·motives. (1 Greenleaf on Evidence, §§ 219, 220; *People* v. *Soto,* 49 Cal. 67; *Rud* v. *Clark,* 47 Cal. 195; *State* v. *Squires,* 48 Cal. 364; *Redd* v. *State,* 69 Ala. 255.) In *Redd* v. *State, supra,* it is said: "It is a well-established maxim of the law that the *admissibility* of evidence is always a question to be determined by the court, and its *weight* or credibility is for the determination of the jury. It is for the court, therefore, to say whether the confessions of a prisoner are *voluntary* or *involuntary,* and this question being judicially settled, cannot be reviewed by the jury. Hence a charge is erroneous which submits to them the decision of this legal question, and should for that reason be refused." So in *State* v. *Squires, supra,* the same principle is thus stated : "Whether the confession of the prisoner was voluntary or not, is purely a question of fact; as much so as the question whether a witness, offering to testify, was interested or not, or whether a witness was qualified to testify as an expert, or whether the loss of a paper has been shown so as to allow the introduction of secondary evidence of its contents. In this and like cases, the judge who tries the cause must decide, although in some instances he may submit the question of fact to the jury. In either case, whether the decision be by the judge alone, or it be also passed upon by the jury, no exception lies so far as the question is one of fact." When this evidence was offered in the court below it was objected to by counsel for the appellant, because the statements and declarations of the defendant which were offered in evidence, and which he had

sworn were true on the previous occasions referred to, had not been freely and voluntarily made, so as to entitle them to be admitted. Evidence was heard by the court for and against this objection, and the court then decided to admit the evidence offered. In other words, the court decided that these sworn statements of the prisoner were freely and voluntarily made, within the true meaning of that rule of law, and admitted them. The bill of exceptions does not purport to set out all the evidence submitted to the court on that issue. In such case it is not perceived how this court can review the decision of the trial court on that question. (*State* v. *Tom*, 8 Or. 177.) But we are not disposed to rest the decision of this cause on that question alone.

4. Assuming now that all of the matters objected to are confessions, or in the nature of confessions, it is believed that they fall within what might be regarded as an exception to that rule, or if not an exception, a modification thereof in its application to the particular facts disclosed by this record. In order that there may be no misunderstanding as to the precise facts in this case so far as they are disclosed by the record, a brief reference to the testimony is proper. Pending the decision of the court below as to the admissibility of this evidence, the district attorney was sworn and testified in substance: "It is not true, as testified to by the defendant Moran, that I, at any time, either directly or indirectly, agreed to give him anything for testifying in the case against James Kelley. There never was at any time, in my presence, any offer made to the defendant Dan Moran, but this one: That if he should become a witness in the case against James Kelley, he should not be prosecuted for any connection he had with that crime. The statement that I said that I would give him a ticket to go East is entirely false. I never made him any offer except that he should not be prosecuted for any connection which he had with the killing of Frederick Kaluscha, and had he kept his word I certainly would not be here prosecuting him." Policeman Berry, whom it is claimed held out some inducements to Moran to testify against Kelley and make a full disclosure, testified on the same occasion before the court below: "I never

promised him (Moran) any money, or made any threats against
him to do him bodily harm, or made him any offer except that
he should have his liberty if he testified against Kelley. I was
present in the chief of police's room when the offer was made to
Moran to be a witness for the State, and he accepted that offer.
There was no inducement to my knowledge held out to Dan
Moran at the chief of police's office in this city, when he made
the statement I stated he made a little while ago on the stand;
and I heard every word that was uttered in the room during this
interview when the matter was under discussion. No promise
of any kind was made except that of his personal liberty; and
that was made at his own solicitation and request." R. M.
Dement, police judge of the city of Portland, on the same occa-
sion and to the same point, testified in substance as follows: "I
am police judge; I was such in the month of July last; I know
Dan Moran; I didn't know James Kelley until the time of his
incarceration; I don't know that I know all the circumstances
under which Dan Moran became a witness against James Kelley
down in the Police Court; I know a great many circumstances
connected with it; perhaps, as many as anybody other than your-
self. The time at which he made the agreement to become a
witness against James Kelley was in the presence of yourself
(the district attorney), and if my recollection serves me right, the
chief of police, Mr. Berry, one other gentleman, and myself were
in the office of the chief of police in the city jail; this thing had
been brewing, if I may so call it, for quite a time; an effort had
been made to secure the statement of Moran or O'Brien or some-
body knowing the facts with the view of securing the conviction
of some one connected with this crime; it was to that end that
the district attorney, the chief of police, and this other gentle-
man, including myself, had been working. At the time I refer
to, Moran had been talking for some time with various persons,
myself among others, and he was leading us to believe that he
would tell the truth; but there seemed to be one point that he
raised . . . . ; he wanted the assurance of some person upon
whom he could rely, that he would be held harmless in the
matter; that assurance was given to him in my presence by

the chief of police, and I remember that I joined with him in the statement that for the ends of justice, the district attorney would probably agree to it. And I think it was at his request that Mr. McGinn was present at the time I refer to, at Moran's request; there was a positive agreement made at that time, as positive as an agreement could be made . . . . he, Moran, wouldn't be prosecuted provided he would tell the whole truth in the matter." And as to what transpired before the grand jury on the same subject, Mr. Severson testified substantially as follows: " Well, he demanded of the grand jury that they give him their word of honor that they wouldn't prosecute him in case he turned State's evidence; that they would stand by him and not prosecute him. Mr. Ladd assured him that we would do it; that we would see that he wasn't prosecuted in that case if he would turn State's evidence, and tell the whole truth and nothing but the truth. He still hesitated and didn't seem satisfied; and we finally all of us individually consented, and assured him that we wouldn't prefer any charges against him if he would tell the whole truth and nothing but the truth before us and before the trial jury when the trial came off, and he finally consented to that and took the oath. He accepted the proposition that we made to him and was willing to stand by it, apparently. And after he took his oath one of the grand jurors said to him: 'Now, Dan, you know what you are doing; you understand this'—wanted to call it up to him again—and then he went on with his story." The sequel to all this is found in the testimony of Jailer Dougherty as follows: " My name is E. J. Dougherty; in the month of November, 1886, I was employed by Thomas A. Jordan as jailer of the county jail; Dan Moran was in custody as a witness against James Kelley before the grand jury had acted on the case of Kelley; he was kept in close confinement and was allowed no liberties whatever; but after he had agreed to become State's evidence, he was allowed more liberty. On the morning of Saturday, November 6, 1886, knowing that he was to be called to court to testify as a witness, he asked for permission to blacken his boots; he was taken into the witness room, the door being unlocked. The sheriff then sent me in search of

one Casey, another witness, and when I returned he had *left and gone;* he ran away, and I knew he could not be found, although every effort was made to find him." It elsewhere appears in the record that Kelley was then on trial, and that Moran did not appear to testify against him, and that he was acquitted.

In *Commonw.* v. *Knapp,* 10 Pick. 477, the attorney-general wrote the prisoner a letter promising the protection of the government on condition of his making a full disclosure and testifying in the case fully and truly. "The benefit was offered upon the sole condition that he should make an explicit, exact, and full disclosure of every circumstance connected with the event referred to; and he was informed that in case of refusal to answer, touching any topic known to him, or of any evasion, equivocation, or designed contradiction, or withholding of testimony, he was not to receive the benefit. To that he assented." A full confession was made by the prisoner under this arrangement with the attorney-general; but upon being called to testify against his accomplices, he refused to do so. The prisoner was then placed on trial, charged with the same crime, and his confessions previously made under the agreement with the attorney-general were offered in evidence against him. In disposing of his objection made to the admission of this evidence, the court said:—

"The confessions which are now offered in evidence were made deliberately, in part execution of the prisoner's agreement. But upon being called to testify upon the trial of John Francis Knapp, he refused to do so. By his refusal to testify it is admitted that he has forfeited all claim to the extraordinary favor of the government. But in what did that favor consist? It was in not using that confession against himself if he would conduct himself faithfully as a State's witness. By his refusal the government are absolved, and it is now contended that the prisoner is absolved also, and that his confession cannot be used against him, notwithstanding his refusal. Persons who are properly admitted here as State's witnesses are substantially in the same situation as persons in England who are properly admitted to become witnesses for the Crown against their accomplices. The protection of the government is extended on the same terms, although

the forms of proceeding are somewhat different. There, if the witness for the Crown conducts himself fairly, and makes and testifies to a full disclosure, he is recommended to mercy, and a full pardon is always granted. Here the attorney-general, of his own authority, and upon his official responsibility, gives the pledge of the government that the State's witness shall not be prosecuted if he makes and testifies to a full disclosure of all matters in his knowledge against his accomplices. In England as well as in Massachusetts, those who are admitted as witnesses for the government may rest assured of their lives if they perform their engagements; so that it· becomes a material inquiry how those persons in England who have been admitted as witnesses for the Crown are dealt with if they fail to redeem the pledge which they made to the government ·upon receiving the benefit of becoming king's witnesses. And we believe the law to be clearly settled there that if they refuse to testify, or testify falsely, they are to be tried themselves, and may be convicted on their own confession, which was made after they were permitted to become witnesses for the Crown."

This case was decided in 1830, and so far as our research extends has never been overruled or questioned. The rule of of the common law is thus stated in Roscoe's Criminal Evidence (pp. 125, 126): "So where in a case of burglary an accomplice, who had been allowed to go before the grand jury as a witness for the Crown, upon the trial pretended to be ignorant of the facts upon which he had before given evidence, Coolidge, J., ordered a bill to be preferred against him, to which he pleaded guilty, and judgment of death was recorded." (*Rex* v. *Moore*, 2 Lew. C. C. 37.) "So where an accomplice, after making a full disclosure before the committing magistrate, refused before the grand jury to give any evidence at all, Wrightman, J., ordered his name to be inserted in the bill of indictment, and he was convicted on his own confession." (*Rex* v. *Holthem* [Staff. Sp. Ass. 1843], 2 Russ. by Greav. 958.) "So where an accomplice who was called as a witness against several prisoners gave evidence which showed that all, except one who was apparently the leader of the gang, were present at a robbery, but refused to give

any evidence as to that one being present, and the jury found all the prisoners guilty, Parke, B., thinking that the accomplice had refused to state that the particular prisoner was present in order to screen him, ordered the accomplice to be kept in custody till the next assizes and then tried." (*Rex* v. *Hokes* [Staff. Sp. Ass. 1837], 2 Russ. by Greav. 958.) To the same effect are the standard authorities in this country on this subject. (1 Greenleaf on Evidence, § 379; *Whiskey Cases*, 99 U. S. 594; Wharton's Criminal Evidence, § 656; *State* v. *Lyon*, 81 N. C. 600.)

Counsel for appellant seem to overlook the fact that this party is an admitted accomplice in the administering of the drug which caused the death of Frederick Kaluscha, and that he was promised immunity upon the sole condition of his testifying fully as to his knowledge of the crime in the case against Kelley. At the very last moment, when the jury in Kelley's case were in the box, and when he must have known that his refusal to testify would result in the acquittal of Kelley, he fled. By his own act and bad faith he voluntarily laid aside and deprived himself of the protection which had been accorded him. In such case it is difficult to see on what ground he can complain. The authorities cited clearly declare the rule of law applicable to such case, but we think they are supported by the better reason as well. It is the policy of the law that for every violation of its mandates proper punishment shall be inflicted. But this is not always practicable; many crimes are committed in secrecy, and those concerned in their commission find their best security in silence, but even this is not always safe, because circumstances frequently point out the guilty and the means used in the perpetration of the crime with unerring certainty. In other cases some one of the parties concerned in the commission of the crime, prompted, it may be, by a sense of guilt or the fear of discovery and punishment, makes known to the officers of the law his willingness to make a full and complete disclosure of all he knows on the subject, and to testify to the same upon the trial of his accomplices upon the sole condition that he shall not be prosecuted. This is called *a confession*. It is an admission of guilt, and the argument that would exclude this species of evidence

because it may be false would exclude all evidence. Its falsity is possible, and so may be any evidence offered in a court of justice; but it is not rejected for that reason. It is received and tested and weighed by the rules of law, and then the case is determined according to the effect it has produced on the minds of the jury. It must, therefore, be assumed that when a party makes a *confession*, it is an acknowledgment of some degree of guilt on his part in connection with the particular crime. If such confession is made under the sanction of the court or the district attorney, and with the understanding that the party shall make a full and complete disclosure and testify to the same upon the trial of his accomplices, is the State not equitably bound by the terms of such an agreement? And the public faith being thus plighted, could its violation be tolerated for an instant? (*People* v. *Whipple*, 9 Cowen, 707.) And is it not equally true that if the State is bound the party making the confession is also bound to the like good faith on his part? He cannot be permitted to refuse to testify against his accomplice and then claim the full benefit of his agreement with the State, when his confessions are offered in evidence against him. Having wilfully refused to testify against his accomplice, has he not forfeited the immunity which the State offered him upon that sole condition? His only complaint is that the State used his confession against him upon the trial; but this he could have avoided by going on the witness stand and narrating what he knew of the commission of the crime. Having failed to do this, he has no cause of complaint, and especially so where the truth of his confession was not denied by him, but on the contrary, was corroborated by all the attendant circumstances.

In opposition to the numerous authorities cited by respondent, counsel for appellant have referred to *Womack* v. *State*, 16 Tex. 178. It must be conceded that this case tends to support the appellant's contention; but this case rests on the authority of that court alone. No decision of any court is cited to sustain it; nor is *Commonw.* v. *Knapp*, *supra*, nor any of the numerous common-law authorities, referred to; but the court apparently based its decision on the general proposition that to render

a confession admissible it must have been voluntarily made, without the appliances of hope or fear by any other person. In the examination of this question we have not been unmindful of the great care and caution courts must always exercise in the admission of confessions of persons accused of crime, nor of the fact that they must have been freely and voluntarily made; but these considerations do not appear to be sufficient to exclude accusatory facts, freely and voluntarily disclosed by an accomplice under an agreement made by the State, represented by its district attorney, that he will testify fully and truly against his associate in the crime, and who thereafter repudiates his agreement and refuses to testify. In such case the common-law rule undoubtedly is, that such admissions and confessions may be given in evidence against him. And that rule having never been changed or abrogated by any statute, and not being inconsistent with our Constitution or laws, nor inapplicable to our circumstances and condition, must be regarded as in force in this State. The evidence offered and received upon the trial was not, therefore, incompetent on any of the grounds thus far considered. But counsel further insist that Severson's evidence was improperly admitted, for the reason he was a grand juror when the disclosures testified to by him were made by the appellant, and that such statements were made before the grand jury. It therefore becomes necessary to determine whether or not it is competent for the trial court, in the exercise of a sound judicial discretion, to allow a grand juror to testify as to matters which transpired before that body, when, in the opinion of the court, the ends of justice require it.

5. *Grand juror allowed to testify.* The policy of the law generally is that the proceedings before the grand jury are secret. The reasons for this secrecy are many and obvious. It assists them in discharging their important duties; they are not troubled with any questions by the interested or curious; the means and sources of their information are not made public until the trial of the accused, and in many cases the guilty may not know that he is even suspected of crime until he is in custody. But there are cases in which the court is authorized to

XV. OR.—18.

remove this secrecy, and to require the proceedings before the grand jury to be disclosed.

It is provided by section 58 of the Code of Criminal Procedure that a member of a grand jury may be required by any court to disclose the testimony of a witness examined before such grand jury, for the purpose of ascertaining whether it is consistent with that given by the witness before the court, or to disclose the testimony given before such grand jury by any person upon a charge against such person for perjury, or upon his trial therefor. And Mr. Bishop, in his work on Criminal Procedure, volume 1, section 859, states the rule thus: " But when the reasons for keeping the testimony private have passed away, the obligation of secrecy would seem to have ended also. Yet when, in addition to this, the claims of public justice must go unsatisfied unless the disclosure is made, the same reason which originally required secrecy, require that the secret be no longer kept." So in *Burnham* v. *Hatfield,* 5 Blackf., it is said: "Upon the trial, the defendant offered to prove by a member of a previous grand jury some admissions respecting the cause of action made by the plaintiff on his examination before the grand jury. This evidence was objected to, and the objection sustained. We think the witness ought to have been examined. The oath of grand jurors to keep their proceedings secret does not prevent the public or an individual from proving by one of the grand jurors in a court of justice what passed before the grand jury." To the same effect is *Sands* v. *Robinson,* 12 Smedes & M. 704. It is there said: " . . . . it seems not to be contrary to the policy of the law to allow disclosures by the grand jury of what has been testified before them when they are called upon as witnesses in court to speak in relation thereto; but to permit it or not is, in the discretion of the court, according to the time or circumstances of each case." And to the like effect is *State* v. *Broughton,* 7 Ired. 96; 45 Am. Dec. 507; *State* v. *Wood,* 53 N. H. 484; *People* v. *Young,* 31 Cal. 563; *Burdick* v. *Hunt,* 53 Ind. 381; and Wharton's Criminal Evidence, § 110, and n. 5, where the authorities are very fully collated. It may be conceded that the authorities cited from

Missouri and Minnesota are opposed to this view; but it seems clear to us that they are at variance with the great weight of authority on this subject, and in addition to that, they rest upon a narrow and technical construction of the statutes of those States. The court, therefore, did not err in allowing the grand juror Severson to disclose Moran's testimony before that body.

6. *Construing section 748 of the Criminal Code.* Counsel for the appellant insist, also, that the court erred in allowing evidence on the part of the State tending to prove the administering the poison to the deceased by Kelley, and the defendant's complicity therein, for the reason that the necessary facts are not stated in the indictment. The indictment against the appellant is in the usual form in use in this State, and charges him with the crime of murder in the first degree. The Criminal Code, section 748, provides: "All persons concerned in the commission of a crime, whether it be felony or misdemeanor, and whether they directly commit the act constituting the crime, or aid and abet in its commission, though not present, are principals, and to be tried and punished as such." Under this section, any person concerned in the commission of a crime is a principal, and is to be charged as such whether he directly committed the act or not, and all evidence tending to prove his complicity in the crime is admissible under that form of indictment.

7. *Testimony from memoranda.* It appears from the testimony of Severson that before going on the stand as a witness he had read over some memoranda taken before the grand jury by some person other than himself, of the statements of the prisoner before that body, and in that manner refreshed his memory; but he did not refer to or use the same while he was on the witness stand. This witness, before testifying, said he remembered the substance of Moran's statements; and it was that which he repeated to the jury. Appellant's counsel objected to Severson's evidence, because he had referred to the memoranda before coming on the stand as a witness. This objection does not go to the competency of the evidence offered, but to its credibility, a matter which was exclusively for the jury. On his cross-examination

the appellant had the right to test the strength and accuracy of the witness' memory, and of course if the only knowledge he then had of the facts was what he derived from the memoranda, then his testimony would have been weakened to that extent; in fact, would have been shown to be of but little value. On the contrary, if his memory was accurate and retentive, and the facts were present in the mind of the witness, independently of the memoranda, a cross-examination would have rather tended to strengthen than weaken his evidence, and the fact that the witness had looked at this paper, when it appeared that he did not write it himself, or that it was not written under his direction, when he knew the facts recited in it, went also to the credibility of the testimony. It tended to weaken his evidence in some degree, and the jury must have considered this matter in passing on the guilt or innocence of the accused.

8. It appeared in evidence that about two hours and a half after the deceased had been poisoned in Kelley's saloon, and while he was lying on a lounge asleep, in Turk's boarding-house, the appellant took two dollars from the pocket of the deceased, for the purpose of keeping the same safely for him until he should awake. Exception was taken to this evidence, but it was clearly competent. In the first place, it was part of the appellant's statement as to his connection with the transaction. The State also had the right, and it was bound to submit to the jury, not a part, but the substance of his entire statement. It is not perceived that any error was committed in admitting this evidence.

9. *Inspection of place in absence of defendant.* It appears from the record that during the examination of the case the district attorney asked the court that the jury be allowed to view the premises. The defendant's counsel said he would like to have the court make an order that, in addition to viewing the premises, the jury may also view the dark cell and "sweat-box" at the city jail. The district attorney said he was satisfied this should be done. The court stated that the parties having consented, such will be the order; that the jury view the *locus in quo,* and the dark cell and room in the third story of the city

Points decided.

jail. When the prisoner was called for sentence, he objected, for the reason that the jury had been allowed to view the premises where the crime was alleged to have been committed without his presence; but the court overruled his objection and sentenced him, which action of the court is now assigned as error. This objection was presented to this court, and decided adversely to the appellant in *State* v. *Ah Lee*, 8 Or. 214, and we see no sufficient reason to reconsider or review what was then decided.

There were some other questions presented on the argument in behalf of the appellant, and which we have examined, and deem them not of sufficient importance to require separate notice.