## PAUL SCHRACK v. STATE.

No. A-10850.    May 28, 1947.

(181 P. 2d 270.)

Judd L. Black and Sid White, both of Oklahoma City, for plaintiff in error.

Mac Q. Williamson, Atty. Gen., and Sam H. Lattimore, Asst. Atty. Gen., for defendant in error.

JONES, J.  This is an appeal by the defendant, Paul Schrack, from a sentence of seven years' imprisonment in the State Penitentiary, imposed by the district court of Oklahoma county, pursuant to the verdict of a jury finding defendant guilty of the crime of burglary in the second degree.

The sole question presented for determination in this appeal is whether the trial court erred in admitting evidence of a purported confession given by the defendant while he was in the custody of police officers of Oklahoma City, subsequent to his arrest upon a warrant issued in connection with the filing of a criminal complaint against the defendant charging him with the crime concerning which this confession was obtained.

This prosecution was commenced on January 14, 1946, by the filing of a criminal complaint charging the defendant and one Frank Thomas with the unlawful entry into a building belonging to O. F. Bryan & Son on September 15, 1945. The defendant was later arrested at Chickasha, and from Chickasha he was moved to the county jail at Lawton. On September 24, 1946, a deputy sheriff of Oklahoma county, pursuant to the warrant of arrest, issued by an Oklahoma county magistrate for the crime of burglary, hereinabove alleged, went to Lawton and returned the defendant to the Oklahoma county jail. On September 25, 1946, two detectives from the police bureau in Oklahoma City took the defendant, by permisson of the sheriff, from the county jail of Oklahoma county to police

headquarters where defendant was questioned concerning a series of burglaries that had been committed in Oklahoma City. At the time of the questioning of the defendant, the detectives had in their possession a confession made by Frank Thomas, in which he stated that he and the defendant, Paul Schrack, had committed a series of burglaries, including the one herein involved.

In the trial of the case, in detailing the circumstances surrounding the giving of the purported confession by defendant, Officer Ryan testified:

"A. We talked to him, had a conversation with him and he told us he understood we had a statement from Thomas relative to some burglaries and safe jobs, he didn't know how many jobs Thomas had put him in, but he made the statement he was just on four jobs. Now, this is a verbal statement I am referring to at this time. We talked to him further, and asked him if he wanted to give us a written statement, and he said he did not, until he consulted an attorney, and some question came up relative to the attorney, he mentioned the attorney's name, Laynnie, but didn't know his last name, and Officer Harbolt took him to the chief detective's office where there is a straight line phone and he called Laynnie Herrod. Q. In response to that did he talk with an attorney? A. Laynnie Herrod came over and talked to us and got permission to go to the jail and talk to him. Q. Did he talk to any other attorney that you know about, Mr. Ryan, at that time, or near that time? A. Yes; there was an attorney down there from Lawton that came up there with his wife. They got permisssion to go up and see him. Q. You say they talked with the defendant? A. They got permission to go up to the jail and talk to him. They never did talk to him in my presence. Q. At that time or later, was anything he told you reduced to writing? A. It was. Q. When was that? A. After he talked to Laynnie Herrod we brought him back. Now, that might have been the next day, I believe we took the written statement. Q. Where

were you when the statement was reduced to writing, please, sir? A. We brought him down to the second floor where the Detective Bureau is located, took him in a consultation room at the north end of the building. I asked him again if Laynnie Herrod represented him, and he said he did. I asked him if he wanted to give us a written statement and he stated that he did. Q. Now, was what he told you then reduced to writing? Was it reduced to writing? A. It was. Q. Who was present when you reduced it to writing? A. Myself, Officer Harbolt, and a stenographer. Q. Frances Wessinger? A. I believe her name was Wessinger. Q. Did you question him a long time? A. No; I wouldn't say we questioned him very long. I would say the whole procedure of taking the statement, that is, when we came to the taking of it and writing, I would say the whole procedure did not take any more than an hour, if it took that long, I don't remember exactly. Q. Did you use any force or harsh treatment towards the defendant? A. None whatever. Cross-examination: A. We told him (Laynnie Herrod) that we would recommend seven years on the condition that he plead guilty and clean up all the other jobs he was implicated in. Q. Schrack had not made any statements to you until after you had talked to Laynnie Herrod? A. That's right. Q. And you told Herrod that you gentlemen would recommend seven years for this defendant on all of the charges if he would plead guilty? A. Yes, sir. Q. (By Mr. White) Then Herrod went back and talked to him? A. He went back to the jail, I supposed he talked to him but I don't know that part of it. Q. Then you brought the defendant down and he did sign the statement? A. He did. Yes; but not on the same day, however. I don't believe that was all on the same day."

Wayne Harbolt, police detective, testified to the confession of the burglary made by the defendant. He corroborated Officer Ryan by testifying that no threats or coercion were used in securing the statement and that no promises were made to the defendant.

On cross-examination, the witness testified:

"Q. (By Mr. White) Mr. Harbolt, you did make a promise to Mr. Herrod? A. We told Mr. Herrod we would recommend seven years. That was during our conversation with him as his attorney. Q. And that you would recommend seven years in completion of all the charges? A. He asked if he went ahead at that time and entered a plea of guilty— Q. And signed this statement? A. No; I don't believe the statement was mentioned to Laynnie Herrod. I don't think there was ever any statement mentioned to Laynnie Herrod, that is, a written statement. Q. Well, you did ask him to clear up all of these other matters? A. Yes, sir."

The defendant did not testify in the trial of the case before the jury. However, in the absence of the jury, the defendant did testify when the questions of law arose as to the admissibility of the alleged confession. He testified as follows:

"A. Well, they took me out of the county jail to the city jail. Q. Do you mean by that Lieutenant Harbolt and Ryan? A. That is right, and kept me in the third degree room over there for about an hour and a half, and told me they had three or four charges they could pin against me, and if I didn't clarify them they were going to see I got ten to life on each and every one of them. I told them I never heard anything about the charges; I could not clarify nothing. Officer Harbolt went outside and came back with a whole handful of confessions, and he said, 'Maybe this will help to clarify it.' I said, 'I don't even know them guys.' He said, 'Oh, yes, you do.' So, he said, 'If you will clear these cases up for us and everything like that, so these Oklahoma City business men will get off my throat, we will let you plead guilty and clear them all up.' I said, 'I haven't done anything like that, Mr. Harbolt. I don't want to clear nothing.' He said, 'You will before this is over with'; and Mickey Ryan, then, he asked me did I have an attorney, and I told him yes I did have one. He said, 'What is his name?' I told him it

was Louis Eskie from Lawton. He said, 'Well, a Lawton attorney is not going to do you no good. You want an Oklahoma City lawyer, somebody that can do you some good up here.' More questioning, more threatening with fingers in my face, and all they were going to do and one thing and another. I sent him to call Laynnie Herrod. Immediately after that they took me back upstairs and put me in the investigation cell. Well, I would say 20 or 30 minutes later Laynnie Herrod came up and wanted to know how much money I had, and I said, 'Why do I have to have money?' He said, 'You have to have money.' Q. Did Mr. Herrod at that time bring you a message from the policemen. about the length of time they would make you pay? A. No; not at that time. Q. Did he later, then? A. Yes. Q. Tell the judge what that was. A. He said that I had better co-operate with the police, and that they would recommend me seven years if I would clear it all up. I said, "I don't know nothing to clear up, but I do know they can frame me, I know that.' The next time he came up, that is when he told me about the seven years. They finally got their heads all together and got me down and agreed on the third day I would sign it. Q. With the understanding you would have seven years? A. Seven years and everything was washed up."

On cross-examination the defendant testified:

"Q. Have you been convicted under the laws of the State of Oklahoma? A. Yes, sir. * * * Q. (By Mr. Mounger) Now, before you signed this instrument here, Exhibit 3, Louis Eskie of Lawton represented you, didn't he? A. Louis Eskie represented me at Lawton. Q. He was up here too, wasn't he? A. He came up here after I was in a few days, in the city jail. Q. And he talked with you before you signed this statement? A. He talked with me the day before, yes, sir. Q. And Laynnie Herrod talked with you, didn't he? A. Yes, sir. Q. Before you signed the statement? A. Yes, sir. Q. And also you talked with Opal Hunt, didn't you? A. Yes, sir."

Later, the defendant refused to plead guilty, repudiated his confession, employed present counsel to defend him and went to trial on the burglary charge in the instant case. It is agreed that the failure to enter a plea of guilty was not because of the refusal of the officers to recommend a term of imprisonment of seven years in the penitentiary, but that the officers were ready and willing to make such recommendation if the defendant would enter his plea of guilty.

The evidence at the trial was not lengthy. The owner of the building which was burglarized testified to facts establishing that a burglary was committed in which approximately $900 was taken from a wall safe. Frank Thomas, an accomplice of defendant, testified against defendant and the confession made by the defendant to the policemen was admitted in evidence. It is conceded that if the confession was not admissible as evidence against the defendant that there was not sufficient corroboration of the testimony of the accomplice to sustain the conviction.

It is contended by counsel for defendant that the confession of defendant was procured by a promise of benefit to the defendant made to his counsel who in turn conveyed the promise to defendant, and that this promise was the moving cause and sole inducement for the making of the alleged confession, and because of such inducement the confession is involuntary and inadmissible as evidence against the defendant.

Counsel cite the general rule of law as follows:

"It is a well established general rule, sometimes affirmed by statute, that a confession of guilt by accused is admissible against him when, and only when, it was freely and voluntarily made without having been induced

by the expectation of any promised benefit, or by the fear of any threatened injury, or by the exertion of any improper influence." 22 C. J. S. § 817.

Several cases were also cited in support of this general rule in which the courts of last resort of several states, including this court, had held inadmissible confessions which were obtained from accused persons in custody either upon the grounds that the confessions were obtained by coercion, threats, or by such promises of benefit as induced the accused to make the admissions which were sought to be used as evidence against him. We have examined each of the cases cited in the brief of counsel for defendant. In every case cited, where the confession was held involuntarily made and inadmissible in evidence, the statement involved was given to officers at times when the accused had not had the benefit of counsel and without the aid and advice of counsel.

There are two important facts which distinguish this case from those cited by counsel for defendant. In the first place, the defendant had the benefit of the counsel of not only one attorney but of two different attorneys who advised with him before he made any statement at all to the officers. In the second place, the officers did not make any promise to the defendant at any time and the promise which they made to his counsel was not a promise to secure the making of a confession, but was a promise that they as officers would recommend a sentence of seven years if the defendant would plead guilty. Such an agreement of the officers would only be subordinate to a plea of guilty. If such an agreement was made, it could not be executed by the officers because defendant refused to enter a plea of guilty.

In Mays v. State, 19 Okla. Cr. 102, 197 P. 1064, certain rules of law were established which have been consistently adhered to by this court as follows:

"A confession is a voluntary statement made by a person charged with the commission of a crime, wherein he acknowledges himself to be guilty of the offense charged, and discloses the circumstances of the act, or the share and participation which he had in it.

"Extrajudicial confessions are those which are made by the defendant out of court, whether to an official or nonofficial person, and such confessions, in order to be admissible, must be entirely free and voluntary."

"Confessions induced by a promise of benefit or threat of harm, made to the defendant by a prosecuting attorney, or an officer having him in custody, or by any one having authority over him, or made by a private person in the presence of one whose acquiescence may be presumed, will be deemed involuntary, and will be inadmissible as evidence."

"Where the competency of a confession is challenged on the ground, that, if made, it was not voluntary, its admissibility is primarily a question for the court. In the absence of the jury, the court should hear the evidence offered respecting the facts and circumstances attending such alleged confession, and the burden is on the defendant to show that it was procured by such means or under such circumstances as to render it inadmissible, unless the evidence on the part of the state tends to show that fact. If it is held competent, and the proof of the same admissible, the defendant is entitled to have the evidence in regard to the facts and circumstances under which it was made given anew to the jury, not that the jury may pass upon its competency or admissibility, but for the purpose of enabling them to judge what weight and value should be given to it as evidence, and the jury may disregard it if they are not satisfied that it was voluntarily made."

"The fact that the defendant was under arrest and in jail, and was not warned that any statement made by him might be used against him, will not affect the admissibility of any voluntary statement made by him, which would otherwise be competent."

In the body of the opinion it is stated:

"The object with which the law admits a confession in evidence is to obtain truth. The only ground on which a confession is rejected is that the circumstances under which it is obtained have a tendency to falsehood; and therefore the object with which it is admitted, instead of being secured, is likely to be frustrated. Bishop says:

" 'The doctrine, in its essence and divested of its technicalities, is that a defendant's confession is admissible in evidence against him if made freely and without the hope of benefit to his cause; otherwise it is rejected, since its purpose may have been to secure such benefit rather than to disclose the truth.' " Bish. New Cr. Proc. par. 1217.

As Mr. Wharton has well said:

"The real question is whether there has been any threat or promise of such a nature that the prisoner would be likely to tell an untruth from the fear of the threat, or hope of profit from the promise." Wharton, Cr. Ev. § 658.

"Looking at the general principles of admissibility and the comparative rarity of untrustworthy confessions, as well as the contingent nature of the dangers supposed to flow from improper inducements, the more practical rule would be to receive confessions without question, unless they are shown to have been improperly induced, especially since a contrary rule may involve the difficulty of proving a negative." Wigmore on Ev. par. 860.

In the case of State v. Moran, 15 Or. 262, 14 P. 419, 420, it is held:

"On trial for murder the confessions of the defendant, made by him, as an admitted accomplice, when another person was on trial for the same crime, are admissible in evidence, when they have been made under an agreement with the district attorney that, if he would testify fully all he knew concerning the murder, he should not be prosecuted for any complicity therein, and subsequently he escaped from custody, and failed to perform his part of said agreement."

In the body of the opinion the Supreme Court of Oregon stated:

"Assuming now that all of the matters objected to are confessions, or in the nature of confessions, it is believed that they fall within what might be regarded as an exception to that rule, or, if not an exception, a modification thereof in its application to the particular facts disclosed by this record. In order that there may be no misunderstanding as to the precise facts in this case so far as they are disclosed by the record, a brief reference to the testimony is proper. Pending the decision of the court below as to the admissibility of the evidence, the district attorney was sworn, and testified in substance: 'It is not true, as testified to by the defendant, Moran, that I at any time, either directly or indirectly, agreed to give him anything for testifying in the case against James Kelley. There never was at any time, in my presence, any offer made to the defendant, Dan Moran, but this one: That, if he should become a witness in the case against James Kelley, he should not be prosecuted for any connection he had with that crime.' "

"In Commonwealth v. Knapp, 10 Pick [Mass], 477, [20 Am. Dec. 534], the attorney general wrote the prisoner a letter promising the protection of the government on condition of his making a full disclosure, and testifying in the case fully and truly. 'The benefit was offered upon the sole condition that he should make an explicit, exact, and full disclosure of every circumstance connected with the event referred to; and he was informed that

in case of refusal to answer touching any topic known to him, or of any evasion, equivocation, or designed contradiction or withholding of testimony, he was not to receive the benefit. To that he assented.' A full confession was made by the prisoner under this arrangement with the attorney general; but, upon being called to testify against his accomplices, he refused to do so. The prisoner was then placed on trial charged with the same crime, and his confessions previously made under the agreement with the attorney general were offered in evidence against him. In disposing of his objection made to the admission of this evidence, the court said: 'The confessions which are now offered in evidence were made deliberately, in part execution of the prisoner's agreement; but, upon being called to testify upon the trial of John Francis Knapp, he refused to do so. By his refusal to testify it is admitted that he has forfeited all claims to the extraordinary favor of the government. But in what did that favor consist? It was in not using that confession against himself if he would conduct himself faithfully as a state's witness. By his refusal the government is absolved, and it is now contended that the prisoner is absolved also, and that his confession cannot be used against him notwithstanding his refusal. Persons who are properly admitted here as state's witnesses are substantially in the same situation as persons in England who are properly admitted to become witnesses for the crown against their accomplices. * * * In England, as well as in Massachusetts, those who are admitted as witnesses for the government may rest assured of their lives if they perform their engagements, so that it becomes a material inquiry how those persons in England who have been admitted as witnesses for the crown are dealt with if they fail to redeem the pledge which they made to the government upon receiving the benefit of becoming king's witnesses. And we believe the law to be clearly settled there that if they refuse to testify, or testify falsely, they are to be tried themselves, and may be convicted on their own confession which was made after they were permitted to become witnesses for the crown.' "

"It is the policy of the law that for every violation of its mandates proper punishment shall be inflicted. But this is not always practicable. Many crimes are committed in secrecy; and those concerned in their commission find their best security in silence; but even this is not always safe, because circumstances frequently point out the guilty, and the means used in the perpetration of the crime, with unerring certainty. In other cases some one of the parties concerned in the commission of the crime, prompted, it may be, by a sense of guilt, or the fear of discovery and punishment, makes known to the officers of the law his willingness to make a full and complete disclosure of all he knows on the subject, and to testify to the same upon the trial of his accomplices, upon the sole condition that he shall not be prosecuted. This is called a confession. It is an admission of guilt, and the argument that would exclude this species of evidence because it may be false would exclude all evidence. Its falsity is possible, and so may be any evidence offered in a court of justice; but it is not rejected for that reason. It is received, and tested and weighed by the rules of law, and then the case is determined according to the effect it has produced on the minds of the jury. It must therefore be assumed that, when a party makes a confession, it is an acknowledgment of some degree of guilt on his part in connection with the particular crime. If such confession is made under the sanction of the court or the district attorney, and with the understanding that the party shall make a full and complete disclosure, and testify to the same upon the trial of his accomplices, is the state not equitably bound by the terms of such an agreement? And the public faith being thus plighted, could its violation be tolerated for an instant? People v. Whipple, 9 Cow., [N. Y.], 707. And is it not equally true that, if the state is bound, the party making the confession is also bound by the like good faith on his part? He cannot be permitted to refuse to testify against his accomplice, and then claim the full benefit of his agreement with the state when his confessions are offered in evidence against him. Having willfully refused to tes-

tify against his accomplice, has he not forfeited the immunity which the state offered him upon that sole condition? His only complaint is that the state used his confession against him upon the trial; but this he could have avoided by going on the witness stand, and narrating what he knew of the commisson of the crime. Having failed to do this, he has no cause of complaint, and especially so where the truth of his confession was not denied by him, but, on the contrary, was corroborated by all the attendant circumstances."

The Court of Criminal Appeals of Texas, in the case of Bradford v. State, 125 Tex. Cr. R. 41, 66 S. W. 2d 320, upheld the admissibility in evidence of a confession made by an accused under an agreement to turn states evidence where the agreement is violated by the refusal of the accused to testify.

Counsel for the defendant have cited no case where any court has ruled inadmissible a confession made by a defendant where he had the benefit of the advice of counsel of his own choosing at the time the confession was made on the ground that the confession he made was involuntary. We have made an extensive search and have found none. All of the cases cited by counsel which held inadmissible confessions as involuntarily made were in instances where the accused had made the statement without the benefit of the advice of counsel.

One of the cases closest in point to the facts herein involved is a case from our own court, Smallwood v. State, 14 Okla. Cr. 125, 167 P. 1154. The defendant, Smallwood, in that case was charged jointly with three other persons with the crime of robbery. Smallwood had employed counsel to represent him. Before the trial and during the time Smallwood was in jail, he had a conversation with the county attorney in which the county attorney agreed

that if the defendant, Smallwood, would return the property which had been taken in the robbery to Stewart, the complaining witness, and that if Stewart failed to return to testify in the examining trial which had been set for a future date, the case would be dismissed. Following this agreement, Stewart made a confession and told the officers where they could locate the property which had been taken in the robbery. The property was found in places where Smallwood in his confession had told the officers it was located. When the examining trial was had Stewart appeared and testified. At the time of the trial in district court, counsel for Smallwood objected to the admission of the evidence of the confession on the ground that at the time it was made Smallwood was in custody and was induced to make the same by a promise of benefit to him. In ruling that the confession was admissible as evidence this court stated:

"The only immunity discussed or inducement offered by the county attorney to the accused, through their attorney, was to dismiss the case if the injured party failed to return and testify at the examining trial."

"As we view the record, the county attorney lived up to his agreement with the accused and they are entitled to no just complaint against him or the other officers of the court on account of the declarations, admissions, and confessions admitted, nor is [defendant] entitled to complain on account of the proof of his actions in going with the officers to recover the property taken in the robbery and surrendering it to Stewart. Under the circumstances disclosed all the proof of these facts was properly admitted in evidence."

An analysis of the evidence concerning the confession of the defendant, Schrack, reveals the following:

(1) Before any alleged inducement was made to defendant's counsel, Schrack told the officers that he

did not know how many jobs Thomas had put him in but he had only done four jobs.

(2) He refused to make a written statement concerning the four jobs until he consulted with his attorney.

(3) The defendant called Laynnie Herrod over the telephone and asked him to come to the city jail.

(4) Defendant consulted with Herrod and also with another attorney, Louis Eskie, several times during a two-day period before he told officers he was ready to make a written statement.

(5) The officers told counsel for defendant that if he pleaded guilty and cleared up all the burglaries he had committed, they would recommend seven years on his plea of guilty. (This was the maximum sentence upon conviction for burglary in the second degree.)

(6) The defendant was kept in the city jail at his own request so that he could visit his wife daily. Under the rules of the county jail, visitors were only allowed on Tuesday. He was not being detained at the city jail against his will for the purpose of procuring a confession from him; but he asked to be kept there where he could see visitors each day.

(7) At the time the confession was made, the defendant did not mention that his counsel had told him the officers would recommend seven years, if he would plead guilty and nothing was said in the conversation concerning his plea of guilty.

(8) The officers were ready and willing to recommend seven years if Schrack pleaded guilty but after Schrack employed other counsel he refused to enter a plea of guilty and upon the trial was given the same

sentence by the jury which the officers agreed to recommend.

In Oklahoma it is well established that:

"Prima facie any confession is admissible in evidence; and where its admissibility is challenged by the defendant, the burden is on him to show that it was procured by such means or under such circumstances as to render it inadmissible, unless the evidence on the part of the state tends to show that fact." Berry v. State, 4 Okla. Cr. 202, 111 P. 676, 31 L. R. A., N. S., 849; Guthery v. State, 24 'Okla. Cr. 183, 216 P. 948; Thornton v. State, 49 Okla. Cr. 380, 293 P. 583.

In the case of Tarkington v. State, 41 Okla. Cr. 423, 273 P. 1015, this court said:

"The admissibility of a confession, where it is challenged, is a question solely for the court, after hearing in the absence of the jury, all the evidence on each side respecting the circumstances under which the confession was made; and the court is vested with a large discretion in determining the matter." See, also, Dold v. State, 51 Okla. Cr. 426, 2 P. 2d 97.

In the instant case, the trial court, in a hearing in the absence of a jury, determined as a matter of law that the confession was voluntary and that evidence of it should be submitted to the jury. The court then proceeded to allow the defendant to show the manner in which the confession was obtained and the court correctly submitted the issue to the jury as to whether the statement made to the officers was voluntary and advised them in his instructions that if they should find that the statement was given by reason of any inducements or threats or violence offered to defendant to secure such a statement, that the confession should be disregarded. The defendant, how-

ever, did not testify before the jury and no evidence was offered in his behalf.

The writer does not look with favor upon any criminal case resting for a conviction upon a confession of the accused, and where a serious doubt arises as to the voluntary nature of the confession, the doubt should be resolved in favor of the accused.

We have given the question here presented careful consideration. The contention of counsel for defendant was a novel one and probably the lack of precedent on the point that was raised is because it was never thought that a confession could be considered involuntary where made after free and deliberate consultation by accused with counsel of his own choosing. Counsel representing the accused in criminal cases often approach the county attorney or arresting officers to see what recommendations might be obtained if the accused would plead guilty. Frequently the county attorney states to counsel for the accused just what punishment he thinks should be meted out to the accused and what would be his recommendation if a plea of guilty was entered. We do not believe that the statement by a county attorney to the attorney for the accused in a criminal case, that he would recommend a certain punishment to the trial court if one accused of crime entered a plea of guilty, would make a subsequent confession by the accused inadmissible against him if he did not enter a plea of guilty, and certainly if a statement by the county attorney to counsel for accused as to what he would recommend provided a plea of guilty was entered would not make a subsequent confession inadmissible than an agreement by arresting officers to such effect would likewise not render the confession involuntary and inadmissible as evidence.

The judgment and sentence of the district court of Oklahoma county is affirmed.

BAREFOOT, P. J., and BRETT, J., concur.