COLUMBUS FOSTER v. STATE.

No. A.-10289.     Nov. 1, 1944.

(152 P. 2d 929.)

184

B. C. Franklin, of Tulsa, for plaintiff in error.

Mac Q. Williamson, Atty. Gen., Sam H. Lattimore, Asst. Atty. Gen., and Dixie Gilmer, Co. Atty., of Tulsa, for defendant in error.

BAREFOOT, J.   Defendant, Columbus Foster, was charged in the district court of Tulsa county with the crime of murder; was tried, convicted, sentenced to serve a term of life imprisonment in the State Penitentiary, and has appealed.

For reversal of this case, it is contended:

"1.   That the court committed reversible error in refusing plaintiff in error's motion to suppress the purported confession of plaintiff in error.

"That the court committed reversible error in admit-

ting said purported confession of plaintiff in error over the objections of plaintiff in error, and erred in not sustaining plaintiff in error's motion to strike same from the consideration of the jury.

"2. That the court erred in not sustaining plaintiff in error's motion for a new trial upon the grounds set out in said motion."

In considering the first assignment of error, it is necessary to state briefly the facts, as revealed by the record.

Defendant, Columbus Foster, was charged with killing Andrew Jack Knowles, in a gambling house in Tulsa, on June 29, 1941. The killing was the outgrowth of a dispute over 15 cents, in which the defendant charged the deceased with having failed to pay him the full amount of his winnings at the crap table which was being operated by deceased.

The gambling house was owned and operated by a negro by the name of Lorenzo Dozier. The deceased was operating the crap table for him. The building contained four rooms. In the first was a bar, to the west was a kitchen, to the north a dance hall, and to the west of the dance hall a room where gambling was conducted. A large opening was between the dance hall and the gambling room, and a door from the gambling room to the kitchen.

On the morning of the killing, defendant went to the premises for the purpose of gambling. He had been there for several hours, and had made bets and won, and had a dispute as to the amount of money he was entitled to receive. He claimed he should have 15 cents more than was paid. Several of the parties finally showed him that he had received all he was entitled to, under the rules of the game. Ike Myers, one of the parties assisting in the opera-

tion of the game, had thrown defendant 15 cents, but told him he was not entitled to the same. Defendant refused to take the money, but said, "You ought to quit taking people's money here"; and also remarked: "Well I am going to break every damn one of you anyhow."

Defendant then left the premises, but returned in 10 or 15 minutes. A number of witnesses who were present when he was there the first time, and also when he returned, testified for the state. It is unnecessary to unduly lengthen this opinion by giving their evidence at length. Some saw one part, others saw more. Some were present from the beginning to the end, and others only saw the first part of the difficulty. There were some minor conflicts as to just what was said by the defendant, both at the time of the controversy over the money, and when he returned. However, all of the witnesses agreed on the material matters surrounding the killing of the deceased. They testified that when defendant returned to the gambling house he was armed with a 45 automatic six-shooter. That immediately upon entering the gambling hall from the large entrance from the dance hall, he fired one shot at the deceased, who was sitting behind the crap table. That the deceased ran to the entrance into the dance hall, and the defendant followed him, firing one shot at him just as he reached the door. That deceased proceeded to the sidewalk, and fell. That defendant fired one shot before he fell, and two shots while he was lying on the sidewalk.

Dr. R. W. Motley, who examined the body of deceased, testified:

"Q. Just tell the jury what wounds you found on the body, and where they were located. A. The first wound I found, it was a bullet, gunshot wound at the base of the

brain. The bullet entered from the rear and passed up through the skull. It entered back here, passed through, and the second one I examined wasn't of much importance to me, was in the buttocks. There were two that I examined. Q. The one in the buttocks, could you tell whether that was an entrance or exit hole? A. I could not find any exit. I found an entrance, but no exit with the one in the buttocks, but I did find an exit of the one in the skull."

Defendant produced no eyewitness to the shooting other than himself. He corroborated the other witnesses, except that he testified that he left the premises to deliver some laundry to two persons. That he went to his home and got the laundry and delivered it prior to returning to the gambling hall. That he had his pistol with him when he was at the gambling hall in the first instance, and also when he returned. That as he entered, the deceased reached over the table and grabbed him, and that as they scuffled his gun went off accidentally. He did not know whether this shot hit the deceased, but did not think it did. He did not remember firing any other shots. When he saw deceased lying on the sidewalk, he went across the street and entered his automobile and went to the country and stayed all night in a field, but gave himself up to a deputy sheriff the next morning. When the officer went after him, he was accompanied by lawyer Ben Franklin, who defended him at his trial. The officer told defendant that he would have to take him before the county attorney. He took him to the office of the county attorney, and he there made a written statement to Mr. Simms, assistance county attorney. Reference will hereafter be made to the statement.

The evidence also reveals that defendant had been convicted in Tulsa county of the crime of larceny of an automobile, and had served a term in the State Peniten-

tiary therefor; and that three empty shells from a 45-calibre pistol were found on the sidewalk near where deceased fell.

The contention is made that the statement of the defendant to the assistant county attorney was involuntary, and was therefore inadmissible. Defendant testified that the officer to whom he surrendered told him it was necessary to take him before the county attorney. We have carefully read the record with reference to the circumstances under which this statement was made, and have come to the conclusion, as did the trial court, that it was a voluntary statement, under the law of this state, and therefore admissible.

The statement is as follows:

"Statement of Columbus Foster, regarding the killing of Jack Knowles, Sunday, June 29, 1941, about 1 p.m., made in the presence of Josh Webb, deputy sheriff. Questioned by M. S. Simms, assistant county attorney. Recorded by Louise Jacobia.

"Q. What is your name? A. Columbus Foster. Q. Where do you live? A. 612 East Pine street. Q. How old are you? A. 33. Q. Are you married? A. No, sir. Q. Just tell in your own words what happened yesterday at 1408 North Madison street. A. I went there and went to gambling. They was gambling and I just got in the game. Q. About how many were in the game? A. Twelve or fifteen. Q. Did you know Jack Knowles before yesterday? A. Yes. Q. Was he in the game? A. He was running the game. Q. After you got in the game, what happened? A. After we got to gambling—I had a dollar bill and I bet the dollar bill that the dice pass and they did pass, and then I just bet the change that the dice hit again, and so they did, and by him running the game he always take a nickel off his bet, and I was due to have $3.90, and when I got it there was but $3.75, that made him cut a quarter off of two

rolls of dice. I asked him for my money. He just said I had all that was due me. I tried to show him I was due $3.90. He said that was all I was going to get. So I told him, 'You all should stop taking people's money.' So I went home and got my gun, a 45 automatic. I came back in. I just came back to gamble some more, and I guess he must have thought I came back to fight him or something. So when I came in the door he came running towards me, then he turned to run from me, that is when I made the first shot. Q. Do you remember how many times you shot him? A. No, sir, I don't. Jack Knowles was going out the door when I made the second shot. Q. Did your second shot hit him in the back? A. I don't know whether it was the second one or first one. Q. After the shot, what did you do? A. Run out to my car and the car wouldn't start, so I pushed the car off. I throwed the gun out on the street up there on Peoria. Q. Are you making this statement voluntarily, of your own free will, in order to clear up this thing? A. Yes, I am making a statement just telling you how it was.

"Columbus Foster.

"Subscribed and sworn to before me this 30th day of June, 1941.

"Seal                    Louise Jacobia, Notary Public.

"My commission expires Aug. 14, 1941."

On cross-examination the defendant admitted that the statement was made "to clear the matter up," and he desired to make it. He admitted that practically every statement therein was true, except that he denied he went home and got his gun, and that he shot the man while he was running. He admitted that he threw the gun away soon after he left the scene of the killing, and that he did so because he knew he had killed a man, and was afraid to be found with it. He claimed that the assistant county attorney did not tell him he was entitled to a lawyer, but ad-

mitted that the lawyer who finally represented him was with him from the time he gave himself up until he was taken to the county attorney's office. However, he testified that he had not employed him at that time, and that he had had no conversation with him in reference to the killing.

With reference to the law as to voluntary and involuntary statements, we have had occasion in recent cases to review the decisions of this court pertaining thereto, and to forcibly express our views as to the duty of the courts with reference to considering this question. It is unnecessary to unduly lengthen this opinion by quoting from them, and we merely cite the cases. Lyons v. State, 77 Okla. Cr. 197, 138 P. 2d 142; Prather v. State, 76 Okla. Cr. 385, 137 P. 2d 249; Fry v. State, 78 Okla. Cr. 299, 147 P. 2d 803. The Lyons case, supra, was appealed to the Supreme Court of the United States, where it was affirmed 322 U. S. 596, 64 S. Ct. 1208, 88 L. Ed.———.

As stated in these cases, this is a question of law for the court, and the jury should be excused when the question is first suggested, and in the absence of the jury, after hearing the facts and circumstances surrounding the securing of the statement, the court should determine as a matter of law whether the statement is voluntary or involuntary. If voluntary, it is admissible. If involuntary, it is inadmissible. This procedure was followed by the court in the instant case, and from an examination of the record, we are of the opinion that, as a matter of law, the trial court was right in holding that the statement made by the defendant was voluntary.

However, we want to again reiterate that public officers should be doubly careful in taking statements from defendants before the filing of charges, or before they have

had an opportunity to have counsel, either of their own choice or appointed for them by the court. The statutes of this state provide for the taking of a defendant before a magistrate after his arrest, and this statute should be strictly followed. The Supreme Court of the United States, in the late decisions, has been very alert in condemning this practice in the federal court, and in the state courts where force or violence is used by officers in procuring statements in contravention of the due process clause of the Federal Constitution. See the case of McNabb et al. v. United States, 318 U. S. 332, 63 S. Ct. 608, 87 L. Ed. 819, and cases cited therein.

The record in the instant case does not show any force or violence on the part of the officers, but, on the contrary, shows there was no violence, and that the defendant desired to make the statement, "to clear the matter up."

The only error revealed by the record in this case is that of the assistant county attorney in his opening statement in making reference to the statement made by the defendant. Objection was made thereto, and the court overruled the objection and permitted the assistant county attorney to state to the jury what the written statement contained. This was improper, for the reason that the court at that time had not had the opportunity to hear the evidence and determine the question as a matter of law, whether the statement was a voluntary or an involuntary one. If the court, after hearing the evidence, had determined as a matter of law that the statement was an involuntary one, and therefore inadmissible, this would have been a very serious error; but the court having found that the statement was voluntarily made, and the jury having been permitted to hear the statement read, we are of the opinion that this was not reversible error.

It is next contended that the court erred in refusing to grant the motion for continuance because of the absence of the witnesses Ella Field and Tex Hurvey.

This motion was filed on December 2, 1941, and set up the absence of the above witnesses, and what their evidence would be. The motion was overruled by the trial court on December 4, 1941, at which time both sides announced ready for trial. No evidence was offered by defendant to sustain the motion, and no subpoena was offered in evidence at this time to show that either of the witnesses had been subpoenaed to appear. There was no evidence of diligence shown by the defendant to secure the attendance of either of these witnesses.

After the case had been on trial for several days, and on December 6, 1941, after all of the testimony had been taken, counsel for defendant offered in evidence three subpoenaes. The first was a subpoena for Mrs. Ella Field and Charley (Tex) Hurvey, received by the sheriff of Tulsa county on October 10, 1941, commanding these witnesses to appear on October 13, 1941. The officer's return shows the same to have been served in person on the witness Ella Field, and on Charley (Tex) Hurvey by leaving a copy at his usual place of residence. The second was a praecipe for a subpoena for Ella Field to appear on December 2, 1941. This was filed on December 1, 1941. The third exhibit was a subpoena issued by the court clerk of Tulsa county to Charley (Tex) Hurvey and another party, and the officer in making his return recites that he served the same on the "within named witness," "I cannot find the within named Charley (Tex) Hurvey in my county." This return was filed December 2, 1941. There is nothing to show any diligence on the part of defendant to secure the attendance of these witnesses. The praecipe for sub-

poena was not filed until the day before this case was set for trial. There was no proof offered to show the whereabouts of the witnesses, and no attachment was asked for or issued for either of them, and there was no proof that they could be procured at a later date. In addition to this, the affidavit for continuance revealed that the testimony of these witnesses was with reference to defendant delivering a package of laundry during the time he left the gambling hall and his return thereto. This was not a material point involved in the killing of deceased, and we are of the opinion that this evidence would in no way have caused a change in the result of this trial. For the reasons above stated, we are of the opinion that the trial court did not abuse its discretion in overruling the motion for continuance filed in this case.

Finding no error in the record, the judgment and sentence of the district court of Tulsa county is affirmed.

JONES, P. J., concurs. DOYLE, J., not participating.