# HENDRICKSON v. STATE.

No. A-11296.   March 7, 1951.

(229 P. 2d 196.)

380

Hickman & Hickman, Tulsa, for plaintiff in error.

Mac Q. Williamson, Atty. Gen., and Sam H. Lattimore, Asst. Atty. Gen., for defendant in error.

POWELL, J.  The plaintiff in error, Burch Andrew Hendrickson, who will hereinafter be referred to as defendant, was charged by information filed in the district court of Tulsa county with the crime of first degree rape, was tried before the court without aid of jury, a jury having been waived, was found guilty and his punishment fixed at fifteen years in the State Penitentiary. Appeal was duly perfected to this court.

A brief summary of the facts prior to a consideration of the legal question involved is indicated.

The record discloses that the defendant was taken into custody on the night of July 19, 1948, and on the following day the confession in question was made and reduced to writing by two policewomen who questioned the defendant, and the charge was filed on the following day after arraignment before a magistrate was duly made.

It appears that defendant was taken into custody for questioning concerning the unsolved murder of a woman named Ruth Norton.  At this time two young women had been assaulted, and Clydene Hendrickson, defendant's adopted daughter, then thirteen years of age, had been a friend and companion of one of these girls, and for such reason had been questioned concerning the matter.  She was no longer living with her foster-parents, but had recently been living with a Mrs. Fuller, a friend

of her foster-mother's. It seems that Clydene had "gotten religion" and was much upset on learning of her chum being assaulted, and she told Mrs. Fuller and finally the officers about her past relationship with her foster-father. His confession followed questioning by the officers.

At trial the evidence developed that Clydene Hendrickson had been adopted by the defendant and his wife when the child was two or three years of age. These people had four other children, but all of them had married and moved away from home when the acts complained of took place.

Clydene testified that she was born January 16, 1934; that in 1945 when she was eleven years of age, she slept upstairs alone at her foster-parents' home in Tulsa, and that sometime before daylight on November 7, 1945, her foster-father came to her bed, made her move over and got in bed and had sexual intercourse with her by putting his privates in her private parts; that a few nights afterwards he again came up some time prior to daylight, she thought around 2 o'clock in the morning, and had intercourse with her, and that this continued every few nights over a period of about two years. That her foster-mother sent her to Mrs. Fuller's to have her hair fixed, and she refused to return and stayed on with Mrs. Fuller. That when her father telephoned her she told him she would not return on account of the way he had treated her. She further testified that no one else ever had sexual relations with her except defendant's married son had sexual relations with her one time after her foster-father commenced his relationship. She claimed that she fought her foster-father but was afraid he would kill her if she cried out. He warned her to tell no one.

Dr. Jess Billington testified that he was the county physician and that he made a pelvic examination of Clydene in July, 1948, and found that her hymen was absent and that she had a large outlet and there was no evidence of any trauma, and that in his opinion she had had intercourse a number of times.

Defendant's confession was introduced, and in it he was asked:

"Q. Have you had sexual relations with Clydene? A. Yes, but I've never had complete intercourse. * * * Q. Have you penetrated her? A. I started to but she said it hurt and I quit. I did penetrate her far enough that it hurt her. * * * Q. Isn't it true that Clydene objected to you having sexual relations with her? A. Yes. Q. But in spite of her objections, you continued this sexual relationship? A. Yes."

Mrs. Ola Mae Hendrickson testified that she was a housewife and preacher, and went about over the country preaching at times. She denied that her husband left her bed long enough to visit the foster-daughter and perform the sexual acts without her discovering it, and she stated that she never missed her husband except when he would go to the toilet, which was downstairs.

The defendant testified that he was 58 years of age; he stated that the night he was arrested and questioned about the Norton case he was also asked about his relations with his foster-daughter, Clydene, and the next day a policewoman questioned him and took his statements down on a typewriter and he read the paper and thereafter signed it. He stated that he had never put his privates in Clydene's; that what he meant by penetration was his fingers, but it hurt and he quit. Clydene on rebuttal testified that it was not his fingers that she

complained of; that he placed his hands on her breasts, but that she saw his penis and that is what he put in her.

There was much other evidence, but further summary is unnecessary in view of the legal point involved.

The court at the close of the evidence stated:

"I will enter my decision now. In my opinion, the evidence shows beyond a reasonable doubt the defendant is guilty of the crime of first degree rape, as charged. The explanation he gives as to the meaning of the statement, in my opinion, is not consistent with the answers he gave when he gave the statement. It is apparent to me, and should be to anybody, from reading the statement; at the time the officers were questioning him, they were talking about sexual intercourse. When he said he did not have a complete act, he means he attempted to with his penis but never had penetrated her. Further than that, there has been no motive shown on the part of Clydene to make the statement. All of the surrounding circumstances convince me the story she tells is true. Altho I think some of the statements she made are not quite true and possibly she has exaggerated some, but I think on various occasions and on the occasion in the charge, the defendant is guilty of first degree rape by having intercourse with a girl fifteen years, or under."

The legal proposition contended for and as stated by counsel, is that:

"A confession is inadmissible if made during illegal detention due to the failure promptly to carry a prisoner before a committing magistrate, whether or not the confession is the result of torture, physical or psychological."

Counsel profess their familiarity with the fact that in the past this court has followed the voluntary-trustworthy test of admissibility of confessions, and being that the admissibility of a confession depends simply upon

whether it is testimonially trustworthy. This rule was applied prior to 1943 by the Supreme Court of the United States in reviewing both state and federal court convictions involving confessions, as is illustrated in Wilson v. United States, 1896, 162 U.S. 613, 16 S. Ct. 895, 40 L. Ed. 1090, and Brown v. Mississippi, 1936, 297 U.S. 278, 56 S. Ct. 461, 80 L. Ed. 682. This, even when the accused had been held for an unreasonable time without arraignment.

In the early case of Berry v. State, 4 Okla. Cr. 202, 111 P. 676, 31 L.R.A., N.S., 849, in an opinion by Judge Richardson, this court held:

"Primarily there are two facts which render a confession inadmissible as evidence: First, that it was obtained under any form of compulsion, so that to receive it in evidence would violate the defendant's constitutional privilege against self-incrimination; and, second, that it was made under such circumstances of hope or fear as to create a fair probability of its testimonial untrustworthiness. * * *

"Prima facie any confession is admissible in evidence; and, where its admissibility is challenged by the defendant, the burden is on him to show that it was procured by such means or under such circumstances as to render it inadmissible, unless the evidence on the part of the state tends to show that fact.

"The admissibility of a confession, where it is challenged, is a question solely for the court after hearing, in the absence of the jury, all the evidence on each side respecting the circumstances under which the confession was made; and the court is vested with a large discretion in determining the matter.

"After a confession has been admitted, the defendant is entitled to have the evidence in regard to the circumstances under which it was made given anew to the jury, not that the jury may pass upon its competency

or admissibility, but for the purpose of enabling them to judge what weight and value should be given to it as evidence, and upon his request the defendant is entitled to an instruction on that point."

And it was specifically held in Wood v. State, 72 Okla. Cr. 364, 116 P. 2d 728, that the jury may disregard a confession if they are not satisfied that it was voluntarily made. But where the evidence on the part of the state shows the confession to have been voluntary, and there is no evidence on behalf of the defendant to show that the confession was involuntarily given, the question of the admissibility of such confession is one of law for the court, and it is not necessary, under such circumstances, to submit such question to the jury. Hix v. State, 29 Okla. Cr. 20, 232 P. 123.

And this court has held that where an officer arrests a defendant without warrant, admissibility of any voluntary statement by defendant is not affected by the legality or illegality of the arrest. Gilmore v. State, 3 Okla. Cr. 434, 106 P. 801, 27 L.R.A., N.S., 151. And see Brinegar v. United States, 10 Cir., 165 F. 2d 512.

The reason for the rule of exclusion by state courts, it is at once apparent from a study of many decisions, is not that truth obtained in violation of the rule would not be acceptable, but because of the great change that the confession might not be true, might not be reliable. In other words, when a confession is made under circumstances involving hope or fear as a basis for obtaining it, such confession is unsafe as evidence, because an innocent person might be caused to confess. 3 Wigmore, Evidence, § 822 (3rd Ed. 1940). Further, it is violative of the Fourteenth Amendment to the Federal Constitution.

See, also, the following cases from this court involving the voluntary-trustworthy test of admissibility of confessions, and where the rule was applied under varying situations: Kirk v. Territory, 10 Okla. 46, 60 P. 797; Hembree v. State, 15 Okla. Cr. 422, 177 P. 385; Mays v. State, 19 Okla. Cr. 102, 197 P. 1064; Hix v. State, 29 Okla. Cr. 20, 232 P. 123; Schrack v. State, 84 Okla. Cr. 260, 181 P. 2d 270; Carr v. State, 85 Okla. Cr. 429, 188 P. 2d 705; Williams v. State, 65 Okla. Cr. 336, 86 P. 2d 1015; Gilmore v. State, 3 Okla. Cr. 434, 106 P. 801, 27 L.R.A., N.S., 151; Fields v. State, 77 Okla. Cr. 1, 138 P. 2d 124; Smallwood v. State, 14 Okla. Cr. 125, 167 P. 1154; Gonzalus v. State, 7 Okla. Cr. 444, 123 P. 705; Ford v. State, 5 Okla. Cr. 240, 114 P. 273; Sealy v. State, 65 Okla. Cr. 356, 87 P. 2d 166; Foster v. State, 79 Okla. Cr. 183, 152 P. 2d 929; Fry v. State, 78 Okla. Cr. 299, 147 P. 2d 803; Williams v. State, 89 Okla. Cr. 95, 205 P. 2d 524; Pressley v. State, 71 Okla. Cr. 436, 112 P. 2d 809; Benton v. State, 86 Okla. Cr. 137, 190 P. 2d 168; and Lyons v. State, 77 Okla. Cr. 197, 138 P. 2d 142, 140 P. 2d 248; Id., 322 U.S. 596, 64 S. Ct. 1208, 88 L. Ed. 1481, opinion by Reed, Douglas concurs in the results, Rutledge dissents, Murphy dissents, Black concurs in dissenting opinion.

But counsel in their brief states:

"We desire this court to pass squarely on this proposition in the light of the two decisions of the Supreme Court of the United States [being McNabb v. United States, 318 U.S. 332, 63 S. Ct. 608, 87 L. Ed. 819 (1943), and Upshaw v. United States, 335 U.S. 410, 69 S. Ct. 170, 93 L. Ed. 100 (1948), and which are, in view of the latter case, authority for the rule that unlawful detention, without more, requires rejection of a confession otherwise admissible], and we believe that the court should relax the rule established in the Foster case [above

cited] and follow the rule announced in the McNabb and Upshaw cases."

Counsel argue:

"Why should this court not follow the rule laid down by the Supreme Court of the United States? Why should the Federal court and the State court differ so widely on such a rule of law? Citizens of the State of Oklahoma are also citizens of the United States of America."

The inquiry propounded is a reasonable one. But to commence with, we would point out that this court, in Fry v. State (1944), supra, expressly declined to follow the McNabb rule. However, by reason of the Upshaw case being a later case than McNabb and our Fry case, and now there being no doubt as to the extent of the McNabb rule, which was somewhat in doubt by reason of the Mitchell case (United States v. Mitchell, 322 U.S. 65, 64 S. Ct. 896, 88 L. Ed. 1140) and now that an appeal is before us where from the facts there is absolutely no contention that the prisoner was coerced or mistreated, and where it is admitted that the confession was voluntary, but where it is contended that there was illegal delay, which ipso facto vitiated the confession, in that the delay was in violation of our arraignment statute, Tit. 22 O.S.A. § 181, which provides: "The defendant must, in all cases, be taken before the magistrate without unnecessary delay", and for violation of which the officers may be charged with a misdemeanor, we shall pass squarely on this single issue raised.

A significant fact in the necessary consideration of the many Federal cases is that in each instance in the basic cases wherein the rule we are now asked to adopt was promulgated and developed, it was by a divided court. We must in consequence give consideration to the dis-

senting opinions. The issue is a delicate one. We would here reiterate the expression of our late Judge Barefoot, in Lyons v. State, supra, 77 Okla. Cr. 197, 138 P. 2d 152, where he said:

"It has always been the practice of this court to follow the decisions of the Supreme Court of the United States, and especially is this true in cases involving the construction or application of the Constitution of the United States. Our high regard for the decisions of that Court; their eminent fairness and legal learning justifies its recognition as the highest court in the land."

In the Fry case it was pointed out, however, that the Supreme Court of the United States, by its decisions, has limited its power to undo convictions in state courts to the enforcement of the fundamental principles of liberty and justice which are secured by the Fourteenth and other amendments to the federal Constitution. Lyons v. State, supra; Hebert v. Louisiana, 272 U.S. 312, 47 S. Ct. 103, 71 L. Ed. 270; Brown v. Mississippi, supra; Chambers v. Florida, 309 U.S. 227, 60 S. Ct. 472, 84 L. Ed. 716; Vernon v. Alabama, 313 U.S. 540, 61 S. Ct. 833, 85 L. Ed. 1509; White v. Texas, 310 U.S. 530, 60 S. Ct. 1032, 84 L. Ed. 1342; Townsend v. Burke, 334 U.S. 736, 738, 68 S. Ct. 1252, 92 L. Ed. 1690; State v. Pierce, 4 N.J. 252, 72 A. 2d 305, 312.

The question raised by the defendant herein is not a constitutional question at all. Neither the McNabb nor Upshaw cases settled any constitutional questions. The holding in those cases merely settles a matter of Federal practice pursuant to federal rule, and therefore this court is not obliged to adopt the rule espoused by the McNabb and Upshaw cases. Only compelling and convincing reasons would justify this court in departing from what has been considered the settled law in this

jurisdiction. Anderson v. State, 7 Okla. Cr. 130, 123 P. 442; Parker v. State, 7 Okla. Cr. 238, 122 P. 1116, 124 P. 80.

At the outset, we are forced to recognize and give consideration to the fact that almost every state in the Union has a statute similar to Rule 5(a) (1948) of the Federal Rules of Criminal Procedure, 18 U.S.C.A., which rule superseded 28 Stat. 416, Aug. 18, 1894, 18 U.S.C. § 595 (1940) and which directs that "An officer making an arrest * * * shall take the arrested person without unnecessary delay before the nearest available" committing magistrate and when the arrested person appears before the magistrate "a complaint shall be filed forthwith", yet, the state courts have uniformly refused to apply the McNabb rule in state prosecutions. See annotation, 93 L. Ed. pp. 115-127; also 94 A.L.R. 1036; and Palmore v. State, 244 Ala. 227, 12 So. 2d 854; Hightower v. State, 62 Ariz. 351, 158 P. 2d 156; Jones v. State, 213 Ark. 863, 213 S.W. 2d 974; People v. Nagle, 25 Cal. 2d 216, 153 P. 2d 344; Cahill v. People, 111 Colo. 29, 137 P. 2d 673, 148 A.L.R. 536; State v. Zukauskas, 132 Conn. 450, 45 A. 2d 289; Coker v. State, 199 Ga. 20, 33 S.E. 2d 171; People v. Thomlison, 400 Ill. 555, 81 N.E. 2d 434; Hicks v. State, 213 Ind. 277, 11 N.E. 2d 171, 12 N.E. 2d 501; State v. Smith, 158 Kan. 645, 149 P. 2d 600; Commonwealth v. Mabey, 299 Mass. 96, 12 N.E. 2d 61; State v. Higdon, 356 Mo. 1058, 204 S.W. 2d 754; People v. Kelly, 264 App. Div. 14, 35 N.Y.S. 2d 55; State v. Biggs, 224 N.C. 23, 29 S.E. 2d 121; State v. Nagel, 75 N.D. 495, 28 N.W. 2d 665; Carr v. State, 85 Okla. Cr. 429, 188 P. 2d 705; McGhee v. State, 183 Tenn. 20, 189 S.W. 2d 826, 164 A.L.R. 617; Cates v. State, 118 Tex. Cr. R. 35, 37 S.W. 2d 1031.

See, also, in connection with the question now raised by the defendant an excellent article by Mr. Harry Carver and appearing in the Oklahoma Law Review, Vol. 11, No. 3, pp. 337-351, August, 1949, and which evidences a keen understanding of the problem at hand.

We are taught by the hereinafter cited federal cases that if the confession is induced by sufficient coercion, then it is excluded under the due process clause of the Fifth and Fourteenth Amendments. Haley v. Ohio, 1948, 332 U.S. 596, 68 S. Ct. 302, 92 L. Ed. 224; Malinski v. New York, 1945, 324 U.S. 401, 65 S. Ct. 781, 89 L. Ed. 1029; Ashcraft v. Tennessee, 1944, 322 U.S. 143, 64 S. Ct. 921, 88 L. Ed. 1192; Lisenba v. California, 1941, 314 U.S. 219, 62 S. Ct. 280, 86 L. Ed. 166; Ziang Sung Wan v. United States, 1924, 266 U.S. 1, 45 S. Ct. 1, 69 L. Ed. 131.

The rule first pronounced in the McNabb case but firmly established by the Upshaw case, is to be applied only when a confession is in fact voluntary, and where there may be no doubt as to the truthfulness of the confession, but where there was illegal delay in arraignment.

To properly understand the McNabb and Upshaw cases, the Anderson, [Anderson v. United States], 1943, 318 U.S. 350, 63 S. Ct. 599, 87 L. Ed. 829, opinion by Frankfurter, Rutledge taking no part, Reed dissenting, and being a case where a man was arrested on a Sunday night and confessed after two hours' questioning on Monday morning, his confession being held inadmissible under authority of the McNabb and Mitchell, 1944, 322 U.S. 65, 64 S. Ct. 896, 88 L. Ed. 1140, opinion by Frankfurter, Douglas and Rutledge and Reed concurring in results, Black dissenting; and Ashcraft cases (opinion in latter case by Black, Jackson dissenting and

Frankfurter and Roberts joining in dissenting opinion) should be particularly studied in connection therewith. As indicated, it is also important that the dissenting opinions should be analyzed. We particularly recommend a study of Justice Jackson's dissenting opinion in the Ashcraft case, where the whole problem is brought to light—and where even Justice Frankfurter concurred in the dissent.

Prof. Fred E. Inbau of Northwestern University, in an article entitled "The Confession Dilemma in the U. S. Supreme Court", and appearing in the Illinois Law Review, Vol. 43, No. 4, Sept.-Oct., 1948, and being prior to the Upshaw decision, makes an interesting analysis of the McNabb and Ashcraft cases, and which reads, in part:

"From a reading of the undisputed evidence of police abuses in these various state cases (Chambers v. Florida, 309 U.S. 227 [60 S. Ct. 472, 84 L. Ed. 716] (1940); White v. Texas, 310 U.S. 530 [60 S. Ct. 1032, 84 L. Ed. 1342] (1940); Ward v. Texas, 316 U.S. 547 [62 S. Ct. 1139, 86 L. Ed. 1663] (1942) one can find an explanation for the development of the Supreme Court's critical attitude as it was soon to be expressed in the decisions and opinions in the now famous cases of Mc-Nabb v. United States, and Ashcraft v. Tennessee. In fact, the impression is clear in the first of these two cases that the Court, or at least the justice who authored the opinion, had been waiting impatiently for an early opportunity to invoke some very drastic measures in an effort to curb police .interrogation abuses. Since the Court's supervisory power over lower federal courts and federal law enforcement officers afforded the Court greater latitude in imposing its sanctions, the opportune moment to embark upon its crusade would be in a federal rather than a state case, even though the latter type of case involved far more frequent instances of police abuses. Then along came McNabb v. United States.

"In an investigation into the killing of an agent of the Alcohol Tax Unit of the Bureau of Internal Revenue, investigators from that Bureau apprehended five members of the McNabb family. As each of the McNabb brothers was arrested the officers proceeded to interrogate him regarding the killing. Five or six hours after the last McNabb was arrested he confessed upon being told that his brothers had accused him of firing the fatal shot. Later on two others confessed their implication in the crime. A federal court trial resulted in a verdict of guilty, and the defendants ultimately appealed to the United States Supreme Court, alleging that the confessions were improperly admitted into evidence. The Government contended that the confessions were voluntarily given and therefore properly admitted.

"Ordinarily an issue of the sort raised in the McNabb appeal would have been resolved on the basis of a due process inquiry. Here, however, the Court conceded that since the defendants had not been threatened, abused, or otherwise coerced, there was no problem of constitutional law respecting the confessions and their admissibility, but stated that its reviewing power in federal cases was not confined to the ascertainment of constitutional validity. Mr. Justice Frankfurter, in speaking for the majority of the Court, said that 'judicial supervision of the administration of criminal justice in the federal courts implies the duty of establishing and maintaining civilized standards of procedure and evidence', and that such standards 'are not satisfied merely by observance of those minimal historic safeguards * * * summarized as "due process of law" '. The Court then explained that upon arresting the McNabb brothers the officers put them in 'barren cells' and kept them there for many hours of 'unremitting questioning', instead of taking them 'before a United States commissioner or a judicial officer, as the law requires, in order to determine the sufficiency of the justification for their detention.' Because of this supposed infraction of the law by the officers, the Court held that the confessions obtained during the delay in arraignment should not have

been admitted in evidence, and the convictions were accordingly set aside. The Court considered the officers' conduct a 'flagrant disregard' of federal laws and expressed the view that if the convictions were upheld the Court would become an accomplice to the wilful disobedience of the law; and that although Congress had not explicitly forbidden the use of evidence so procured, if the courts permitted such evidence to stand they would stultify the policy which Congress enacted into law. In opposition to this view, Mr. Justice Reed in his dissent objected to 'broadening the possibilities of defendants escaping punishment by these more vigorous technical requirements in the administration of justice.' 'If these confessions are otherwise voluntary,' said Justice Reed, 'civilized standards * * * are not advanced by setting aside these judgments because of acts of omission which are not shown to have tended toward coercing the admissions.'

"A rather amazing feature of the McNabb case is the fact that the defendants actually had been arraigned promptly, but the trial court record did not disclose the arraignment and the Supreme Court erroneously assumed that no arraignment had occurred until after the confessions had been obtained. [See Circuit Court of Appeals' decision affirming the conviction of the McNabbs upon their second trial: (6 Cir.) 142 F. 2d 904] Moreover, the fact of actual arraignment was even called to the Court's attention in the Government's petition for a rehearing, but to no avail. A retrial of the case resulted in a second conviction which was affirmed by the Circuit Court of Appeals and the case ended there.

"In addition to the Court's mistaken interpretation of the factual situation in the McNabb case, the federal statute relied upon by the Court as embodying a policy which it thought an affirmance of the case would 'stultify' was actually enacted for distinctly other reasons than the one assumed by the Court. Its legislative history, to be subsequently discussed in further detail [please refer to the article], reveals that the sole purpose of the

act was to suppress a practice whereby federal commissioners and marshals were cheating the Government in the matter of fees and mileage expense charges. The issue of interrogation practices and confessions was entirely without Congressional consideration.

"One year after the Court promulgated its 'civilized standards' doctrine for federal cases, a somewhat similar attempt was made regarding state law enforcement practices. In Ashcraft v. Tennessee [322 U.S. 143, 64 S. Ct. 921, 88 L. Ed. 1192] the defendant had been taken late one afternoon to a morgue where he identified as his wife the body of a woman who had been beaten to death. From the morgue Ashcraft was escorted to the county jail and questioned for several hours, after which he was released without having been placed under formal arrest. Nine days later he was arrested and taken to jail for further questioning. He was then interrogated intermittently for 28 hours, whereupon he told the officers a man named Ware had killed his wife. Ware, who had not been suspected previously, was arrested and he promptly admitted the killing, stating further that Ashcraft had hired him to do it. Ashcraft was confronted with Ware's confession and the interrogation continued for another 8 hours, at the end of which time Ashcraft admitted his guilt but refused to sign a written confession. He repeated his admission of guilt to two business men and to his own family physician, who were called in to witness the confession. The doctor also examined Ashcraft and found him free from any signs of physical abuse. His oral confession was admitted in evidence and his conviction in the trial court was affirmed by the Supreme Court of Tennessee. Upon appeal to the United States Supreme Court, however, that Court, in a six to three decision, reversed the conviction on the ground that the holding of Ashcraft incommunicado, without sleep or rest, for 36 hours of interrogation, was 'inherently coercive' and a violation of the 'due process' of law provision of the Fourteenth Amendment.

"In its consideration of the Ashcraft case the majority of the Court made what appears to be an abstract psy-

chological appraisal of a thirty-six hour interrogation and decided that an interrogation of that duration was 'inherently coercive', for which reason the confession would be held inadmissible regardless of the effect of the police practices upon the particular defendant and regardless of the otherwise trustworthiness of the confession.

"The principal objection to the Ashcraft case has been directed not so much to the result in the particular case, but to the general rule laid down in the majority opinion. For instance, in his dissenting opinion in the Ashcraft case, Mr. Justice Jackson severely criticized the majority opinion for excluding a confession 'on an irrebuttable presumption that custody and examination "are inherently coercive" if of some unspecified duration within thirty-six hours.' In his analysis of the case, Justice Jackson expressed the view that 'despite the "inherent coerciveness" of the circumstances of Ashcraft's examination, the confession when made was delivered free, and voluntary in the sense in which that term is used in criminal law.'

"In further criticism of the majority opinion of the Court, Justice Jackson said: 'The court bases its decision on the premise that custody and examination of a prisoner for thirty-six hours is "inherently coercive." Of course it is. And so is custody and examination for one hour. Arrest itself is inherently coercive, and so is detention. When not justified, infliction of such indignities upon the person is actionable as a tort. Of course such acts put pressure upon the prisoner to answer questions, to answer them truthfully, and to confess if guilty. * * * If the constitutional admissibility of a confession is no longer to be measured by the mental state of the individual confessor but by a general doctrine dependent on the clock, it should be capable of statement in definite terms. If thirty-six hours is more than is permissible, what about 24? or 12? or 6? or 1? All are "inherently coercive." '

"A careful examination of the Ashcraft case, especially when considered along with several other more recent Supreme Court decisions involving confessions, gives rise to the impression that what the Court was seeking to accomplish by its 'inherent coercion' rule was to compel state law enforcement officers to employ what it considered to be a higher standard of interrogation practices. This it could not do directly, because of the absence of constitutional authority for any such inroads upon state government, but the same attempt was available, for all practical purposes, by extending the Court's interpretation of the Fourteenth Amendment due process clause in confession cases to prohibit 'inherently coercive' police practices."

Justice Reed in his dissenting opinion in the Upshaw case indicates his familiarity with the various articles by recognized law professors and students of the law, appearing in various law reviews and bar journals throughout the country, in which the McNabb case had been criticized for abandoning the voluntary-trustworthy test as to the admissibility of confessions in an apparent attempt to indirectly punish police officers for failure to comply with the arraignment statute, but where such failure was not shown to have caused the confession. But Justice Reed, contrary to the thought expressed in his dissenting opinion in the McNabb case, in view of certain expressions of the writer of the majority opinion in the Mitchell case, does not think that the Supreme Court was attempting by the McNabb rule by indirection to punish public officers, because of the expressions to the contrary in that later opinion.

In the Mitchell case the defendant spontaneously confessed within a few minutes after arrival at the police station. He was held eight days before arraignment. The police claimed that the detention was without pro-

test while he helped them clear up 30 housebreakings, the booty from which was found at his home. The court held that "the illegality of Mitchell's detention does not retroactively change the circumstances under which he made the disclosures." [322 U.S. 65, 64 S. Ct. 898.] It is not without significance that Justice Black, the writer of the Upshaw opinion, dissented in the Mitchell case. Justice Black in the Upshaw opinion rejected the confession made after thirty-one hours detention or a total of thirty-six hours prior to arraignment. Because, as stated, the confession of the defendant was the "fruit of the illegal detention". [335 U.S. 410, 69 S. Ct. 171.] He applies the so-called "civilized standards" rule promulgated in the McNabb case. There was evidence that the accused was under the influence of liquor when first detained. There was no claim of abuse. Upshaw confessed and the officers required some time to check up on his statements. He was an habitual criminal.

In contrast with the McNabb-Upshaw thesis, is the following statement of Chief Justice Taft in Olmstead v. United States, 277 U.S. 438, 468, 48 S. Ct. 564, 569, 72 L. Ed. 944, 952, 66 A.L.R. 376:

"Nor can we, without the sanction of congressional enactment, subscribe to the suggestion that the courts have a discretion to exclude evidence, the admission of which is not unconstitutional, because unethically secured. This would be at variance with the common-law doctrine generally supported by authority. There is no case that sustains, nor any recognized text-book that gives color, to such a view. Our general experience shows that much evidence has always been receivable, although not obtained by conformity to the highest ethics. The history of criminal trials shows numerous cases of prosecutions of oathbound conspiracies for murder, robbery, and other crimes, where officers of the law have disguised

themselves and joined the organizations, taken the oaths, and given themselves every appearance of active members engaged in the promotion of crime for the purpose of securing evidence. Evidence secured by such means has always been received.

"A standard which would forbid the reception of evidence, if obtained by other than nice ethical conduct by government officials, would make society suffer and give criminals greater immunity than has been known heretofore. In the absence of controlling legislation by Congress, those who realize the difficulties in bringing offenders to justice may well deem it wise that the exclusion of evidence should be confined to cases where rights under the Constitution would be violated by admitting it."

The rule in the Mitchell case was tentatively incorporated into the proposed Federal Rules of Criminal Procedure several years ago and submitted for consideration by the Bar, proposed as Section B reading:

"No statement made by a defendant in response to interrogation by an officer or agent of the government shall be admissible in evidence against him if the interrogation occurs while the defendant is held in custody in violation of this rule."

See article by Prof. John Baker Waite, Michigan Law Quarterly, Vol. 42, No. 4, February, 1944. In this article Prof. Waite (page 689) points out:

"The response to the proposal, when it appeared in the form of admitted rule-making, instead of the cryptic legislation of judicial decision, was prompt and vigorous. Federal judges, discussing the problem at their conferences, pointed out that the rule would penalize an offending officer not at all; would merely throw upon society a risk of ineffective enforcement. Some recognized the McNabb decision as law, but deprecated its crystallization into an acknowledged rule; others questioned the force of the decision itself; all disapproved

the rule as proposed. Federal district attorneys were even more critical; one expressed the sentiments of others thus: 'Rule 5(b) is an attempt to petrify into a rule the unfortunate decision contained in United States v. McNabb [McNabb v. United States]. The McNabb decision was judicial legislation and not interpretation. The common law was and is that contained in the dissenting opinion. The law should remain as it was before the McNabb decision. The undersigned feels that the court in that decision and the Rules Committee had a high theoretical purpose, but lost sight of crime statistics and a realistic appreciation of crime detection * * *'

"As a spokesman of crime detection officials, J. Edgar Hoover. Director of the Federal Bureau of Investigation, protested that the rule, 'would handicap law enforcement, would be contrary to public interest, and would serve only the criminal whose advantages seem to be paramount to the public welfare in the suggested procedural requirement.' Continuing, he said:

" '3. The requirements set forth in the two sections of the proposed Rule 5, in many instances, would serve to defeat the ends of justice. Modern criminals seldom operate alone and this is particularly true with regard to the more serious violations of kidnapping, bank robbery and other similar crimes of violence. Immediate arraignment of the first member of a criminal gang who is arrested, with the resultant public record and publicity, would frustrate plans of enforcement officers to apprehend the other individuals and conspirators involved. The result would be a vast additional expenditure of money and the very definite possibility of an increase in the number of law enforcement officers killed by criminals. The situation becomes more aggravated in cases involving spy rings and sabotage gangs. The immediate arraignment of the first spy arrested would jeopardize the entire investigation and cause the other conspirators to flee and would further jeopardize the Nation's security. Expediency rather than immediacy should be a determining factor in deciding how soon in the pub-

lic interest an individual taken into custody should be arraigned.' "

Mr. Hoover goes on to cite a number of major crimes solved by his department that could not have been solved if the officers had not had opportunity to question a number of involved persons, who confessed.

Prof. Wigmore, a recognized authority on evidence, concerning the matter of questioning defendants without violence over a period of time in its relation to rules of exclusion, in his book on evidence published prior to the McNabb and cases that followed, says:

"In the case of professional criminals, who usually work in groups, there is often no hope of getting at the group until one of them has 'peached', and given the clues to the police. The police know this, and have known it for generations in every country. The only ones who apparently do not know it are some of the Supreme Court Justices. * * * The attitude of some judges towards these necessary police methods is lamentable; one would think that the police, not the criminals, were the enemies of society. To disable the detective police from the very function they are set to fulfill is no less than absurd. Let the judges who sit in judgment on crime look a little into the facts. Let them not sit up aloft and dictate a rule which ignores the well-known facts of criminal life and hampers the needful methods of justice.

"But, it is argued, there are abuses by the police. Very true, here and there, at least. It does not follow, however, that a stricter rule of exclusion for confessions is the proper remedy. It is still a misguided remedy. The first remedy is to improve police personnel. The second one is to provide a means of speedy confession which shall be less susceptible to abuses, while still taking advantage of the inherent psychological situation. In short, let an authorized skilled magistrate take the confession. Let every accused person be required to be taken before a magistrate, or the district attorney, promptly upon ar-

rest, for private examination; let the magistate warn him of his right to keep silence; and then let his statement be taken in the presence of an official stenographer, if he is willing to make one.

"Such, in general, is the method of other civilized countries. Such is the method long ago adopted in England."

Prof. Wigmore also argues that an opportunity for interrogation is also a benefit to the innocent because it allows him an early opportunity to tell his story. He is saved the humiliation of having a charge filed, even though it may later be dismissed for lack of evidence.

A bill known as the "Hobbs Bill" was introduced in Congress to nullify the effect of the McNabb case by providing that a failure to observe the statutory requirements regarding the time when an arrested person was to be brought before a committing officer shall not render incompetent any evidence otherwise admissible. H. R. 3690. See 89 Cong. Rec. 9711 (1943). By reason of the Mitchell case some of the supporters of the Hobbs bill thought the McNabb rule had been relaxed, and though prior thereto there were strong indications that the bill would be enacted into law, it was finally defeated. See 90 Cong. Rec. 9367 (1944). But in view of the Upshaw opinion it is reasonable to expect further effort in Congress to modify that rule.

We feel, as Prof. Inbau, that Justice Harold M. Stephens recognized the crux of the whole problem when he testified before the Judiciary Committee on the Hobbs bill and made the following statement:

"The cure for third degree abuses is not in rules of exclusion of voluntary confessions but in improved personnel and facilities for police forces so that character

and efficiency and scientific methods rather than brutality will be used to obtain evidence. If an officer is so stupid and brutal as to use third-degree methods, he will do so, despite rules of exclusion of voluntary confessions from evidence, in order to get leads to other evidence. Ill. L. R. Vol. 43, No. 4, p. 461."

We would now consider the case of People of State of New York v. Malinski, 1944, 292 N.Y. 360, 55 N.E. 2d 353; Malinski v. New York, 1945, 324 U.S. 401, 65 S. Ct. 781, 89 L. Ed. 1029. While the "inherently coercive" doctrine of Ashcraft v. Tennessee was applied first to a case arising in a federal district court, the Malinski case originated in the Kings county, New York court, a state court, and is a typical case where such rule has been applied when it reached the Supreme Court of the United States.

A policeman, Leon Fox, was acting as a guard and was accompanying a manager of a theatre to a bank depository. Unknown persons stepped from a car and shot the policeman, took the money from the theatre man and departed. Months later the police received information that one Malinski, Rudish and Indovino participated in the killing and robbery. Malinski was taken into custody and questioned off and on for several days and eventually confessed. He and one Rudish were jointly tried and convicted. On appeal to the Court of Appeals of New York it was sought to reverse the case because the accused was not promptly taken before a committing magistrate, and because it was contended that the various confessions were coerced and inadmissible as a matter of law. It is important that the evidentiary matters detailed in the opinion of the Court of Appeals of New York be studied in order to properly appreciate the issues. The convictions were sustained. There could rea-

sonably be no doubt of the guilt of Malinski. Said the Court, in part:

"We shall first consider the question whether, when a prisoner is not brought before a magistrate without unnecessary delay, following his arrest, a confession obtained after such unnecessary delay is admissible at all or must be excluded. This Court has given earnest consideration to that problem in the past and has resolved it in favor of the admission of the confession to be followed by an instruction that it must be disregarded if obtained through fear produced by threats and that, in reaching a conclusion thereon, the jury may take into consideration the circumstance that the confession was obtained while arraignment was illegally delayed. [Citing cases] It seems to us that applicable and convincing reasoning leading to that conclusion was declared with clarity in People v. Devoe [Defore] 242 N.R. 13, 23, 24, 25, 150 N.E. 585, 588, 589, Cardozo, J. We need not quote at length. There are a few sentences which indicate the reasoning: 'We are confirmed in this conclusion when we reflect how far-reaching in its effect upon society the new consequences would be. The pettiest peace officer would have it in his power, through overzeal or indiscretion, to confer immunity upon an offender for crimes the most flagitious. * * * We may not subject society to these dangers until the Legislature has spoken with a clearer voice. * * * The question is whether protection for the individual would not be gained at a disproportionate loss of protection for society. On the one side is the social need that crime shall be repressed. On the other, the social need that law shall not be flouted by the insolence of office. There are dangers in any choice. The rule of the Adams case [People v. Adams, 176 N.Y. 351, 68 N.E. 636, 63 L.R.A. 406] strikes a balance between opposing interests. We must hold it to be the law until those organs of government by which a change of public policy is normally effected shall give notice to the courts that the change shall come to pass.' We have made our choice." [292 N.Y. 360, 55 N.E. 2d 357.]

As to the issue of the confession being inadmissible as a matter of law, the New York Court of Appeals said:

"There was no testimony as to violence except by Malinski. Neither Rudish nor Indovino claimed to have been assaulted although in the same hotel with the same officers. Neither of them confessed to the police or District Attorney. Whether the confession therefore was induced by fear produced by threats and violence was for the jury to determine. They weighed his testimony as to the violence and they considered the fact that he was compelled to spend most of one day clothed in his underwear and a blanket and the excuse of the police that that was a way to prevent escape in the hotel. Whether these latter circumstances would procure fear so that a man would confess his crime would depend a great deal upon the type of man involved. We do not think it can be held *as a matter of law* that it brought about such fear that the confession followed. All those questions it seems to us were for the jury which saw Malinski and heard him. They were in a position to judge from his appearance and attitude what effect depriving him of his outer clothing would have upon him."

Chief Judge Lehman filed a dissenting opinion concurred in by two other judges.

In the Supreme Court of the United States it was held, among other things, in spite of the findings of the jury after instructions that it is not denied complied with the state law, that the confession was coerced, and that a judgment of conviction will be set aside even though the evidence apart from the confession might have been sufficient to sustain the jury's verdict. It was held further:

"A confession will be deemed to have been coerced, so as to make its introduction in evidence a denial of due process, where defendant, charged with murder in the commission of a robbery, upon being arrested, was taken

to a hotel, stripped to see whether he had any wounds and not allowed for several hours to put on his clothes, was not allowed to see a lawyer, although he asked for one, or any friends, other than one also charged with participation in the robbery, whereupon, after being held from 8 A.M. to 6 P.M. he confessed, although he was not subjected to more than occasional questioning or anything except his own apprehension that he might be beaten."

Mr. Chief Justice Stone wrote a dissenting opinion in which Justices Roberts, Reed and Jackson concurred. Pertinent portions of this opinion read:

"After a painstaking review of the facts, the New York Court of Appeals unanimously sustained the jury's verdict that the confessions were not coerced. That court, on appeal from a judgment of death, has power, which we are not free to exercise in a case coming from a state court, to make new findings of fact, Art. 6, § 7 of the New York Constitution of 1939; People v. McGrath, 202 N.Y. 445, 450, 96 N.E. 92, and also to give judgment without regard to technical errors defects or exceptions not affecting substantial rights. N.Y. Code Crim. Proc. § 542.

"It seems to be recognized by this Court that the question whether the second confession was coerced was properly submitted to the jury. But it holds that the first confession was coerced and was submitted to the jury as itself proof of guilt and that for that reason the verdict must be set aside although the jury found under the instructions of the court, which we have quoted, that the second confession was not coerced.

"Even though the first confession were the product of coercion, the trial court, as we have pointed out, instructed the jury that the evidence with respect to the first confession was adduced only to show that the second was coerced. And the jury was instructed that it could consider the second confession, only if it found it voluntary, and that it could convict in that case. In

view of these instructions, we cannot say that the first confession was submitted to the jury, or that in the absence of any exception or request to charge more particularly, there was any error, of which petitioner can complain. Hence the jury's verdict must be taken as conclusively establishing that the second confession was voluntary and was not induced by any coercion attending the first. Lyons v. Oklahoma, 322 U.S. 596, 64 S. Ct. 1208, 88 L. Ed. 1481.

"But even if it could be said, as the Court of Appeals seems to have thought, that the jury's verdict was a determination that the first confession was not coerced, we perceive no ground on which that determination can be disregarded. This Court recognizes that if only the testimony submitted to the jury be considered, the question whether the first confession was coerced was for the jury. The Court sets aside the jury's verdict solely because of the interpretation it places upon the conflicting testimony in the light of certain remarks, which the opinion of Mr. Justice Douglas quotes, made by the prosecuting attorney in the course of his summation to the jury. But the prosecutor did not testify in the case, and it does not appear that he was present at any of the interviews of petitioner by the police, or had any knowledge of the alleged coercion. At most, his remarks were an ill advised attempt at justification of the coercion which the defense had alleged. He added no word by way of proof or admission to the evidence already before the jury. The jury, acting within its province, could have concluded, as it evidently did, that the prosecutor's remarks did not tend to prove anything more than his own ineptitude. The Court's decision thus sets aside the conviction by the process of re-weighing the conflicting testimony as to the alleged coercion, in the light of the arguments addressed to the jury.

"It is not the function of this Court, in reviewing, on constitutional grounds, criminal convictions by state courts, to weigh the evidence on which the jury has pronounced its verdict, also in the light of the arguments

of counsel, *or to sit as a super-jury.* [Emphasis supplied.] We have, in appropriate cases, set aside state convictions as violating due process where we were able to say that the case was improperly submitted to the jury or that the unchallenged evidence plainly showed a violation of the constitutional rights of the accused. Brown v. Mississippi, 297 U.S. 278, 56 S. Ct. 461, 80 L. Ed. 682; Chambers v. Florida, 309 U.S. 227, 60 S. Ct. 472, 84 L. Ed. 716; Ward v. Texas, 316 U.S. 547, 62 S. Ct. 1139, 86 L. Ed. 1663. But we have not hitherto overturned the verdict of a state court jury by weighing the conflicting evidence on which it was based.

"The rightful independence of the states in the administration of their own criminal laws in their own courts requires that in such cases we scrupulously avoid retrying the facts which have been submitted to the jury, except on a clear showing of error substantially affecting the constitutional rights of the accused. We agree that the controlling principles upon which this Court reviews on constitutional grounds a state court conviction for crime, are as stated in the opinion of Mr. Justice Frankfurter. But the due process clause of the Fourteenth Amendment is concerned with matters of substance. It cannot rightly be made the instrument of reform of the manner of state officials. And however reprehensible or even criminal the acts of state officials may be, in so far as the conduct of the trial is concerned, they do not infringe due process unless they result in the use against the accused of evidence which is coerced or known to the State to be fraudulent or perjured, or unless they otherwise deny to him the substance of a fair trial, which is due process. See Lisenba v. California, 314 U.S. 219, 235-238, 62 S. Ct. 280, 289, 290, 86 L. Ed. 166 [179, 180]; Buchalter v. New York, 319 U.S. 427, 63 S. Ct. 1129, 87 L. Ed. 1492, and authorities cited.

"Judged by these standards, we think that there was no denial of due process in submitting petitioner Malinski's confessions to the jury in the manner in which they were in fact submitted, and that there is no constitutional ground for setting aside the jury's verdict against him.

We cannot say on this record that the jury was not rightly permitted to determine whether petitioner's confessions of guilt to the police were coerced, or that the verdict was without support in the evidence, or that the instruction that the jury could find the defendant guilty if it found that the second confession was not the result of the alleged coercion at the time of the first, was not properly given.

"Petitioner Rudish has raised no substantial federal question reviewable here, and his conviction, as well as Malinski's, should be affirmed." [324 U.S. 401, 65 S. Ct. 798.]

Then came Haley v. Ohio, 1948, supra, wherein a conviction in a state court was reversed—and where there could be no doubt as to the actual guilt of the murderer. Mr. Justice Burton filed a dissenting opinion concurred in by Chief Justice Vinson, and Justices Reed and Jackson. Then in 1949 came Watts v. Indiana, 338 U.S. 49, 69 S. Ct. 1347, 1357, 93 L. Ed. 1801, involving the murder of a woman and where there could be no doubt as to the guilt of the accused. The conviction was reversed, with still a divided court. We would quote excerpts from a special concurring opinion by Justice Jackson:

"The seriousness of the Court's judgment is that no one suggests that any course held promise of solution of these murders other than to take the suspect into custody for the books on the crime and forget it, with the suspect at large. This is a grave choice questioning. The alternative was to close for a society in which two-thirds of the murders already are closed out as insoluble.

"A concurring opinion, however, goes to the very limit and seems to declare for outlawing any confession, however freely given, if obtained during a period of custody between arrest and arraignment—which, in practice, means all of them. * * *

"If the right of interrogation be admitted, then it seems to me that we must leave it to trial judges and juries and state appellate courts to decide individual cases, unless they show some want of proper standards of decision. I find nothing to indicate that any of the courts below in these cases did not have a correct understanding of the Fourteenth Amendment, unless this Court thinks it means absolute prohibition of interrogation while in custody before arraignment.

"I suppose no one would doubt that our Constitution and Bill of Rights, grounded in revolt against the arbitrary measures of George III and in the philosophy of the French Revolution, represent the maximum restrictions upon the power of organized society over the individual that are compatible with the maintenance of organized society itself. They were so intended and should be so interpreted. It cannot be denied that, even if construed as these provisions traditionally have been, they contain an aggregate of restrictions which seriously limit the power of society to solve such crimes as confront us in these cases. Those restrictions we should not for that reason cast aside, but that is good reason for indulging in no unnecessary expansion of them.

"I doubt very much if they require us to hold that the State may not take into custody and question one suspected reasonably of an unwitnessed murder. If it does, the people of this country must discipline themselves to seeing their police stand by helplessly while those suspected of murder prowl about unmolested. Is it a necessary price to pay for the fairness which we know as 'due process of law'? And if not a necessary one, should it be demanded by this Court? I do not know the ultimate answer to these questions; but for the present, I would not increase the handicap on society."

The great concern over the ethics of the police in apprehension and conviction of criminals is amazing. Was the prisoner coerced; that is, beaten, threatened or promised anything? No. Well, still there is a further

question: Was he questioned before promptly being arraigned, released on bond and advised by his lawyer to say nothing? If he was so questioned and confessed, then that was not ethical, was not "ethical" because the time spent in questioning a prisoner is deemed "unnecessary delay."

During the early days of the colonies, the British troops in preparing to do battle with hostile Indian tribes, drew each company up in close order formation, and commenced firing from such position because it was not "cricket" to adopt different tactics. The Indians were behind trees and rocks and soon riddled the open targets and the British met disaster until a colonial officer prevailed upon the Command to adopt tactics necessary to meet the situation, and being open formations, taking advantage of cover, etc.

In Korea, even now, our troops have met an enemy that recognizes no "civilized" rules not of their own making and own standards, and our troops have been subjected to infiltration by enemy soldiery in disguise, and have been subject to the most heinous forms of cruelty. The medical personnel and clergy have not been excepted. Theorizing of officers at a distance give way to the necessities of the situation, so far as concerns the personnel at the point of the life and death struggle.

It may be that great concern over instances of inhuman treatment meted out to individuals in parts of our country and unnoticed by courts of last resort, have brought about what seems to us a most unfortunate rule. It seems regrettable that this rule has come about during a time that our country has become overrun with foreign agents, spies and saboteurs, and with enemies of our way of life, as well as in a period of development of

organized crime and subsidized organizations whose sole purpose is to create discord. The peace officers are at a distinct disadvantage, to say the least, and cannot be expected to accomplish their mission under the handicaps imposed, and such failure may cause desperation among the people and lead to grave evils. It matters not whether the purpose of the McNabb rule is to punish the officers or establish "kid glove" dealings with criminals, the result is the same so far as the American public is concerned. The public is to suffer by reason of judicial legislation that has of course by-passed the legislative branch and is so radical a departure from the past as to seem inherently wrong where not initiated by the people through the legislative branch of our government. The sovereign is punished, which is an anomalous situation in a Democracy.

For a number of years now we have had an increasing number of applications for writs of habeas corpus filed by inmates of our penitentiary who never appealed their cases. but who now claim that conviction was in violation of the Fourteenth Amendment to the Constitution of the United States.

This court throughout its history has not hesitated to reverse cases where the procedural rules established have been violated. A late case is that of Benton v. State, 1948, 86 Okla. Cr. 137, 190 P. 2d 168. In that case and in Lyons v. State, supra, this court has warned officers concerning their conduct toward prisoners, particularly as such would affect the admissibility of confessions under the voluntary-trustworthy test prevailing in our state courts. A reference to Shives' Criminal Digest or the Oklahoma Digest will disclose a long line of cases where this court has reversed convictions

and bottomed on the conduct of the officers, where by reason of coercion or promise in obtaining confessions the same were deemed unreliable. We have a separate statute dealing with officers who unnecessarily delay taking an accused before an examining magistrate. Tit. 21 O.S.A. § 534. No appeal from prosecutions, if any there have been, have reached this court. There have been damage suits that have reached the Supreme Court involving false arrest, failure to arraign on some charge, etc. Lyons v. Worley, 152 Okla. 57, 4 P. 2d 3, being an example. Probably persons actually guilty of crime realize their problem in facing a jury and seeking punishment of an officer who by the very delay complained of was enabled to bring them to task.

From a study of many decisions of the Supreme Court of the United States, including the dissenting opinions, it is at once apparent that there is a sharp division of opinion on fundamentals which can only be accounted for by the background, training and experiences of the particular justice, as well as the individual's ability to overcome inherent prejudices, if any.

As a practical and established fact, in the contest of ideas the question of the guilt or innocence of the accused is lost sight of, it becomes immaterial,—a life and death battle is fought over issues absolutely foreign to that inquiry. With a defendant without a shadow of doubt guilty of the most heinous crime, there is invoked hyper technical reasoning and bold rhetoric to nullify his conviction. The accused is protected with abstract ethical reasoning eminently satisfactory to the authors, and with high ethical purpose, but which the subject has never practiced and ordinarily would hold in contempt. The theoretical is dissolved in the searing light of experience.

And we cannot overlook the fact that the Upshaw case was adopted by only a bare majority of the Supreme Court, and that two of the Justices who concurred in the majority opinion are now deceased, and it is problematical whether the Court as now constituted would adhere to that decision.

Being convinced as we are that already the Fourteenth Amendment is stretched to the breaking point in a number of cases cited and wherein it is sought to "read an undiscriminating hostility to mere interrogation into the Constitution", we emphatically cannot adopt a rule of procedure that would afford an extension of the program we have seen in action.

For the above reasons, the conviction is affirmed.

BRETT, P. J., and JONES, J., concur.